**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| VELOCITY INTERNATIONAL, INC. d/b/a VELOCITY BROADCASTING. | ) | |
| Plaintiff, | ) | No. 2:09-CV-00102-WLS and No. 2:09-CV-00151-WLS (consolidated) |
| v. | ) | |
| CELERITY HEALTHCARE SOLUTIONS, INC. f/k/a CELERITY HEALTHCARE SOLUTIONS, LLC | ) | |
| Defendant, | ) | |
| v. | ) | |
| PHILIP ELIAS, | ) | |
| Counterclaim Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Celerity Healthcare Solutions, Inc. ("Celerity"), by its undersigned counsel, submits the following brief in support of its Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

## INTRODUCTION

Celerity's Counterclaim is not the subject of this Motion, but it is germane because it provides context to Velocity's claims in this case. Celerity will prove that Philip Elias orchestrated a scheme to drive Celerity out of business in order to garner for himself the significant profits that Celerity was earning. Elias' order directing Velocity to file two meritless lawsuits against Celerity was merely another step in furtherance of his scheme. It was irrelevant

to Elias that Velocity's claims are baseless and cannot withstand any critical examination, as they never were intended to be meritorious claims. These claims were merely a part of Elias' scheme to conjure up a basis to terminate the exclusive rights that Celerity had earned and take for himself the profitable business that Celerity had built.

Velocity's two primary claims fail as a matter of law. The first, that Celerity is required to pay more than half a million dollars for the "cancellation" of two broadcasts that were never under contract is not based on any term of the parties' agreement, written or oral, and is entirely inconsistent with their prior course of conduct. The second, that Celerity violated the Lanham Act by using the phrase "Celerity-Velocity" rather than "Velocity-Celerity," is pure cavil and is particularly ironic when the single marketing document that used that phrase was part of an endeavor that resulted in millions of dollars in revenues for Velocity.

Finally, because Velocity's two primary claims in this lawsuit were its only stated grounds for terminating Celerity's exclusive rights under its Reseller Agreement, and because both those claims are insufficient as a matter of law, Celerity is entitled to a declaration that Velocity's early termination was in material breach of the Reseller Agreement.

Celerity therefore requests that this Court dismiss Velocity's claims in their entirety, and issue a declaration that Velocity's early termination of the Reseller Agreement constitutes a material breach of the Agreement

## PROCEDURAL HISTORY

Velocity filed two lawsuits against Celerity on January 28, 2009 and February 5, 2009. [1] The first alleged that Celerity had breached the Reseller Agreement by failing to pay "cancellation" fees for two broadcasts that were never agreed upon between Celerity and its customer. (Complaint, No. 2:09-CV-00102-WLS, [Docket No. 1], Count I.) and sought a declaratory judgment that the failure to make these payments constituted a material breach entitling Velocity to terminate the Reseller Agreement. (*Id.*, Count II.) The second alleged that Celerity had violated the Lanham Act by using the phrase "Celerity-Velocity" instead of "Velocity-Celerity" in marketing materials (Complaint, No. 2:09-CV-00151-WLS, [Docket No. 1], Counts I and II.), that doing so was a violation of Velocity's "brand guidelines" and a breach of the Reseller Agreement (*Id.*, Count III.), and that Celerity had "solicited" one of Velocity's business partners in violation of the terms of the Reseller Agreement. (*Id.*, Count IV.) And Velocity again asked for a declaration that Celerity was in material breach of the Reseller Agreement and that Velocity was therefore entitled to terminate the agreement. (*Id.*, Count V.)

Celerity filed an Answer and asserted counterclaims against Velocity and against Elias, Velocity's Chief Executive Officer, as a third-party defendant. (Answer and Counterclaim [Docket No. 12].) Velocity and Elias moved unsuccessfully to dismiss Celerity's counterclaims, and Celerity subsequently filed an Amended Counterclaim alleging that Velocity had breached the Reseller Agreement, breached an oral agreement to honor a ten percent discount for AstraZeneca, a significant customer that had booked multiple broadcasts with Celerity, and

[1] The two cases are now consolidated at Docket No. 2:09-CV-00102-WLS. For the convenience of the Court, unless otherwise indicated, all citations to Docket entries are to Docket No. 2:09-CV-00102-WLS.

breached the duty of good faith and fair dealing. Celerity further alleged that Velocity and Elias had tortiously interfered with Celerity's existing and potential contractual relationships by engaging in a scheme designed to put Celerity out of business. (Answer and Amended Counterclaim [Docket No. 23].) Celerity also requested a declaratory judgment that it was entitled to terminate the Reseller Agreement as a result of Velocity's material breaches and be released from any continuing obligations thereunder. (*Id.*)

After all of Elias' efforts to get Celerity to abandon its multi-million dollar business had failed (*e.g.*, refusing to accept innocuous contractual modifications requested by Celerity's customers; reneging on his agreement to provide a ten percent discount for AstraZeneca broadcasts; assessing cancellation fees and other charges not authorized under the terms of the Reseller Agreement; providing Celerity's clients with Velocity's reseller rate cards so that those customers could determine Celerity's internal pricing structure; demanding more and more disclosures about Celerity's marketing efforts and placing more administrative burdens on Celerity, and filing two meritless lawsuits, among other things), Elias resorted to self-help. Rather than wait for this Court to rule on his request for a declaration that he was entitled to terminate Celerity's Reseller Agreement, he simply went ahead and terminated the agreement with a year left on the exclusive rights that Celerity had earned.

This action mooted Velocity's requests for declaratory and injunctive relief, and it rendered the parties' breach of contract claims retrospective rather than prospective. In other words, it no longer mattered whether one of the parties would be entitled to terminate the Reseller Agreement; the question now was whether Velocity's termination had been justified. As a result, the claims now before this Court are somewhat different than the issues framed in the

pleadings. In particular, the parties' competing requests for declaratory judgments now merge into a single request, and this Court can now issue a declaration that Velocity's early termination of the Reseller Agreement either was or was not justified.

## FACTUAL BACKGROUND

### A. The Business Model

Celerity's principals have more than thirty years' combined experience in the pharmaceutical, biotechnology and medical communications industries and had retained significant contacts within those industries that Velocity lacked. In 2006, they were introduced to Velocity by a contact at a multinational biopharmaceutical company that had previously conducted, independent of Celerity, two "pilot" broadcasts with Velocity. The contact indicated that Velocity had a very interesting concept but lacked an understanding of the pharmaceutical industry, and suggested that Celerity's principals contact Velocity to see if there might be an opportunity for the two companies to work together. Celerity's principals, Kurt Janson and Tim Gatzulis, were first introduced to Elias and Velocity through Russell Rice, who was Velocity's President at the time. (Deposition of Philip Elias ("Elias Depo."), a true and correct copy of which is attached to the Appendix at Exhibit 2, pp. 54:6-55:4.)

Velocity was in the business of producing various types of educational and commercial video programs for its clients and broadcasting them into specially-equipped boardrooms at Morton's The Steakhouse ("Morton's) and, later, Maggiano's Little Italy ("Maggiano's) restaurants. After discussions with Velocity, Celerity's principals felt that Velocity's services were a unique way to assist Celerity's clients and contacts in the medical industry. Velocity, in

turn, recognized that Celerity's experience and contacts in the industry could lead to a substantial amount of additional revenues.

The two companies first entered into a business relationship in or about July of 2006, agreeing that Celerity would market and resell Velocity's production services to a specified segment of the pharmaceutical industry. The parties later entered into a second agreement, known as the "Reseller Agreement," which was effective as of October 1, 2007. (App. Ex. 2[2], Elias Depo., pp. 98:3-98:11; App. Ex. 1, Reseller Agreement.) The Reseller Agreement granted Celerity the exclusive right to resell Velocity's services in the "Pharma Segment"[3] for a period of three years if Celerity reached annual revenue targets established by Velocity. (App. Ex. 1, Reseller Agreement, Sec. I, II.A, Ex. A.) It is undisputed that Celerity exceeded these revenue targets and had earned exclusivity through September of 2010, the end of the term of the Reseller Agreement. (App. Ex. 2, Elias Depo., pp. 88:11-24, 89:16-21, 90:15-91:8.) In fact, at his deposition Elias confirmed that as much as 80% of Velocity's total revenue in 2008 was generated by Celerity. (App. Ex. 2, Elias Depo., pp. 32:22-33:12, 91:22-25.)

An overview of Velocity's business model is critical to understanding the frivolity of its current claims. Velocity describes itself as a media organization that produces and delivers broadcasts over its network to audiences at off-site locations. (App. Ex. 2, Elias Depo., pp. 43:19-51:4, 95:4-21.) Prior to joining forces with Celerity, Velocity relied on a direct

---

2 References to the Exhibits to the Appendix in Support of Motion for Partial Summary Judgment are referred to herein as "App. Ex. __".

3 The Reseller Agreement defines the Pharma Segment as: "any manufacturers of drugs, medicines or other non-organic but biologically interactive treatments ... for humans ... for any promotional or educational (IME) programming targeted at physicians, registered nurses or other allied health professionals, clinical investigator or other similar programs and any programs toward pharmaceutical or biotechnology company representatives (collectively "Pharma Segment"). (App. Ex. 1, Reseller Agreement, Ex. A, Sec. IV.)

salesperson that had only limited success in developing the business. (App. Ex. 2, Elias Depo., pp. 45:6-47:17.) Celerity was therefore engaged as a "reseller" in order to develop the market for broadcasts to the pharmaceutical industry.

Under the terms of the Reseller Agreement, Celerity was required to use its best efforts to enter into contracts with its customers that were substantially similar to Velocity's standard "broadcasting" agreement (the "Customer Agreement") attached as Exhibit "B" to the Reseller Agreement. (App. Ex. 1, Reseller Agreement, Sec. II.B.) Any deviation from the terms of the Customer Agreement required the explicit approval of Velocity. (*Id.*) Notably, the Reseller Agreement provides that "Velocity shall not be a party to any Customer Agreement ... ." (App. Ex. 1, Reseller Agreement, Sec. II.B.)

Under the terms of the Reseller Agreement, Celerity was entitled to a 15% discount on the network access fees for all broadcasts it sold, and was expressly permitted to mark up the price of Velocity's services and retain any differences. (App. Ex. 1, Reseller Agreement, Sec. III.A.) In addition, Celerity provided other "value-added" services for which it charged additional fees. These services included its business development efforts, including the identification of potential customers, making recommendations on timing and location of broadcasts, assisting the customer in complying with FDA regulations and requirements, pre- and post-broadcast administration, including facilitation of communications between Celerity's client and Velocity's production staff, and the invoicing and collection of the appropriate payments, along with numerous other services.

Also attached to the Reseller Agreement was a "Sample Reservation Confirmation" that set forth Velocity's policy for confirming a customer's initial reservation of a broadcast date.

(App. Ex. 1, Reseller Agreement, Ex. C, Sample Reservation Confirmation.) The "Sample Reservation Confirmation" acknowledges the customer's interest in a potential broadcast and outlines the "next steps" the customer must take, including the remittance of a $250 non-refundable deposit for each private boardroom into which the customer wishes to have its program broadcast. The Sample Reservation Confirmation provides that "[a]ll Deposits are non-cancelable and non-refundable. You may cancel up to ten percent (10%) of Private Boardrooms booked up to seven (7) calendar days prior to the Broadcast with only the loss of your Deposit." (*Id.*) If a customer wishes to cancel more than ten percent of the boardrooms, or cancel less than seven days before the broadcast, the cancellation will be subject to minimum hospitality charges. (*Id.*)

The Sample Reservation Confirmation outlines the "Next Steps" the customer must take to purchase a broadcast:

> To get us started, we have outlined Next Steps Below:
>
> - Remit your Deposit and a signed copy of this letter for our records within seven (7) calendar days;
> - Review and sign the enclosed Velocity Broadcasting Agreement to allow us to begin work for you; and
> - Velocity Broadcasting will begin planning your Broadcast event upon receipt of a signed copy of the enclosed Velocity Broadcasting Agreement.

(App. Ex. 1, Reseller Agreement, Ex. C, Sample Reservation Confirmation.)

The agreement that customers are expected to sign before Velocity will begin planning a broadcast describes the services that Velocity will provide, including access to Velocity's network, event management and program production in return for the customers' payment of

various applicable fees, including a "network access and event management fee" and "program production services fee". (App. Ex. 1, Reseller Agreement, Ex. B, Sample Customer Agreement.) The Customer Agreement requires partial payment on a fixed schedule, with 35% due upon signature of the Customer Agreement; 35% due thirty (30) days in advance of the broadcast date; and the final 30% payment due seven (7) days in advance of the broadcast. (*Id.*, Sec. 3. 4. 4a.) In practice, however, Velocity only insisted that payment in full be received from Celerity on or before the date of a contracted broadcast. (Deposition of Timothy J. Gatzulis ("Gatzulis Depo."), a true and correct copy of which is attached to the Appendix as Exhibit 12, pp. 160:3-160:10.) The Customer Agreement also requires that contracted customer agree to pay certain cancellation fees if a broadcast is cancelled within a certain number of days of the broadcast. (App. Ex. 1, Reseller Agreement, Ex. B, Sample Customer Agreement, Sec. 4.)[4]

## B. The Cancellation Fees

### 1. The Effient Broadcasts

In the spring of 2008, Celerity began negotiations with MMEG, a medical communications company engaged by the pharmaceutical company Daiichi Sankyo, for the purchase of a broadcast in anticipation of the pending launch of a pharmaceutical initially named "Prasugrel," and later re-named "Effient" (the "Effient Broadcasts".) (App. Ex. 12, Gatzulis Depo., p. 221.) The required approvals from the U.S. Food & Drug Administration were

---

[4] For cancellation less than 60 but at least 30 days before a broadcast date, 35% of the network access fee and event management fee and the program production fee are due. (App. Ex. 1, Reseller Agreement, Ex. B, Sec. 4.a.) For cancellation less than 30 but at least 20 days in advance of the broadcast date, 60% of the network access and event management fee and program production fee is required. For cancellation less than twenty 20 days before a broadcast, 100% of the network access and event management fee and program production fee is due. (*Id.*, Secs. 4.b and c.)

expected for the drug in the early summer of 2008. On June 3, 2008 MMEG requested an initial broadcast date of August 19, 2008 and provided deposits to hold the rooms for the selected sites. (Deposition of Kurt M. Janson ("Janson Depo."), a true and correct copy of which is attached to the Appendix as Exhibit 13, pp. 84:1-85:6, 86:20-89:13; App. Ex. 13.C, Deposit Receipts, p. 3; App. Ex. 2, Elias Depo., p. 232:9-11; Complaint, No. 09-102, [Docket No. 1], ¶29.) Celerity also provided MMEG with a Customer Agreement and requested that MMEG sign it to proceed with the broadcasts. (App. Ex. 13, Janson Depo., p. 81:10-23; App. Ex. 13.B, June 18, 2008 Proposal to MMEG.)

On or about June 26, 2008 the FDA announced that it was extending its review of Effient until September 26, 2008. It therefore was necessary to postpone the broadcast scheduled for August 19, 2008. On June 26, 2008, Celerity notified Velocity of the need to reschedule, and Velocity confirmed on June 27, 2008 that the room deposits provided by MMEG would simply be transferred from August 19, 2008 to a new date (when selected) with no additional charge. (App. Ex. 13, Janson Depo., pp. 107:2-111:9; App. Ex. 13.D, Email dated June 26, 2008; App. Ex. 13.E, Email dated June 27, 2008.) MMEG selected October 28, 2008 as the new broadcast date. MMEG also requested an additional broadcast be scheduled for December 2, 2008, and room deposits for that broadcast were paid on September 17, 2008. (App. Ex. 13, Janson Depo., pp. 86:20-89:13, 116:4-117:9; App. Ex. 13.C, Deposit Receipt; App. Ex. 13.F, Email dated September 19, 2008.)

**2. Negotiations Related to the Proposed Customer Agreement**

While Celerity was working with MMEG to choose dates and locations for the broadcasts, MMEG was also internally reviewing the terms of the proposed Customer

Agreement. Almost immediately, MMEG informed Celerity that MMEG could not execute the Customer Agreement because Velocity's intellectual property provisions directly conflicted with the same provisions in MMEG's contract with its client, Daiichi Sankyo. (App. Ex. 13, Janson Depo., pp. 105:8-106:19.)[5] MMEG therefore asked Celerity to modify those provisions to accommodate its obligations to Daiichi Sankyo.

Because the Reseller Agreement required Celerity to obtain Velocity's written consent to any modifications to the standard Customer Agreement, Velocity was integral to these negotiations. (App. Ex. 1, Reseller Agreement, Sec. II.B.) Celerity immediately informed Velocity of MMEG's requested change for the reason specified above. On September 18, 2008, Celerity again notified Philip Elias via email that MMEG would not sign the contract in its current form. (App. Ex. 13, Janson Depo., pp. 105:8-106:19.) That September 18, 2008 email to Elias stated clearly that MMEG was unable to agree to Velocity's intellectual property provisions because they conflicted with MMEG's agreements with Daiichi Sankyo (as well as MMEG's agreements with Sanofi Aventis, another pharmaceutical company and potential client of Celerity and Velocity). Celerity advised Velocity that "[a]s it stands right now these events will not happen unless a compromise is met." (App. Ex. 2.E, Email Chain dated September 18, 2008; App. Ex. 2.F, Email Chain dated September 18-19, 2008; Esswein Depo., pp. 41:11-43:25; App. Ex. 2, Elias Depo., pp. 182:15-185:4, 186:22-191:20.) Elias acknowledged that

---

5 The IP provision in the Reseller Agreement was inconsistent with both the IP provision contained in the Initial Reseller Agreement and with common practice in the medical communications industry which permitted pharma companies to repurpose certain content. (App. Ex. 8A., Initial Reseller Agreement, Sec. 6.10.) As is shown from MMEG's reaction, Velocity's IP requirements served as an impediment to sales in that market.

Velocity and Celerity would "need to figure something out." (App. Ex. 2.F, Email Chain dated September 18-19, 2008.)

Velocity clearly understood the severity of the situation because Jeffrey Esswein, Velocity's Chief Operating Officer, followed up with an email to Elias, stating: "Currently two dates are booked for 2008 that we may lose if contracts are not signed." (App. Ex. 2.F, Email Chain dated September 18-19, 2008; Deposition of Jeffrey Esswein ("Esswein Depo."), a true and correct copy of which is attached to the Appendix as Exhibit 5, pp. 45:18-46:17, 62:18-64:7.) Nevertheless, Elias refused agree to the IP language MMEG suggested (which was quite typical in the medical communications industry). A November 19, 2008 email confirms that negotiations regarding the intellectual property language still had not been resolved two months later. (App. Ex. 4.E, November 19, 2008 Email.)

**3. Postponement Due to Delays in Receiving FDA Approval**

On September 29, 2008, while negotiations with MMEG were still ongoing, Celerity notified Velocity that the FDA had once again delayed its approval of Effient. (App. Ex. 13.D, Email dated June 26, 2008; App. Ex. 13.E, Email dated June 27, 2008; App. Ex. 6.E, September 29, 2008 Email.) As a result, MMEG asked Celerity to postpone the broadcast scheduled for October 28, 2008 until mid to late January of 2009 (although MMEG anticipated at that time that the broadcast scheduled for December 2, 2008 would go forward as planned). In that same email, Celerity indicated that "there are a lot of moving parts with this, **including contract finalization** ..." (*Id.*) (emphasis added)). Ultimately, both the Effient Broadcasts were postponed and tentatively rescheduled for dates in 2009. (App. Ex. 4.A-4.D, Reseller Forecasts; App. Ex. 6.C, Email dated November 3, 2008.)

**4. Velocity Was Well Aware that No Customer Agreement Was Signed**

When the Effient Broadcasts were postponed for the second time in late September of 2008, Velocity was well aware that a contract had not yet been finalized or executed. There is a virtual mountain of evidence supporting that conclusion:

- As early as July 21, 2008 a Celerity representative wrote to Velocity indicating that no contract had yet been executed for the Effient Broadcasts. Velocity **acknowledged that no payment would be required until the contract was executed**. (App. Ex. 6.B, July 21, 2008 Email);

- In September 19, 2008 Kurt Janson at Celerity again wrote to Philip Elias stating clearly **that MMEG was unable to sign the current contract due to MMEG's current contract with Daiichi and Sanofi. "As it stands right now these events will not happen unless a compromise is met."** (App. Ex. 2.E, Email Chain dated September 18, 2008; App. Ex. 2.F, Email Chain dated September 18-19, 2008; App. Ex. 5, Esswein Depo., pp. 41:11- 43:25; App. Ex. 2, Elias Depo., pp. 182:15-185:4, 186:22-191:20.);

- On September 19, 2008, Jeffrey Esswein, Velocity's Chief Operating Officer followed up with an email to Elias, stating: **"Currently two dates are booked for 2008 that we may lose if contracts are not signed."** (App. Ex. 2.F, Email Chain dated September 18-19, 2008; App. Ex. 5, Esswein Depo., pp. 45:18-46:17, p. 62:18-64:7.);

- In a September 19, 2008 internal email from Susie Franklin to Philip Elias, Ms. Franklin, referring to the Effient Broadcasts, stated **"Isn't that date free – if we don't have payment?"** (App. Ex. 2, September 19, 2008 Email.);

- On September 29, 2008 Celerity's representative indicated that "there are a lot of moving parts with this [the scheduling of the Effient Broadcasts], **including contract finalization** ..." (App. Ex. 6.E, Email Chain dated September 29, 2008.);

- On November 5, 2008, Celerity provided Velocity with a Reseller Forecast indicating that the Effient Broadcasts were **"pending contract signature"** (App. Ex. 3.D., Reseller Forecast.);

- An email from November 19, 2008 confirms that negotiations regarding the intellectual property language in the Customer Agreement were still ongoing. (App. Ex. 4.E, November 19, 2008 Email.); and

- On January 14, March 2, April 1 and May 1, 2009, Celerity provided Velocity with Reseller Forecasts indicating that the Effient Broadcasts were still **"pending contract signature."** (App. Ex. 4.A-4.D, Reseller Forecasts.)

**5. Velocity Imposes New Payment Terms and Exorbitant Cancellation Fees**

On the day it learned that the broadcast proposed for October 28, 2008 would have to be postponed, Velocity began internally discussing how much to charge Celerity for the "cancellation" of the broadcast, even though Velocity was well aware that MMEG had not signed a contract. (App. Ex. 6.E, Email Chain dated September 29, 2008) While Celerity was feverishly working to save these two broadcasts (and the close to a million dollars in revenue they were to generate), Velocity was developing a plan to either: (1) charge Celerity the exorbitant cancellation fees that are the subject of this lawsuit; or (2) extort payment in full for the postponed broadcasts, despite the fact that FDA approval had not yet been obtained and new dates had not even been selected.

Just four days after learning of the postponement, Kate Rhea née Milliron emailed Philip Elias asking him to approve a draft email to Celerity assessing cancellation fees of $225,708.13 for the October 28, 2008 Effient Broadcast **unless** the broadcast was rescheduled prior to January 31, 2009 **and** the full cost of the broadcast was paid in full prior to the end of 2008. (App. Ex. 6.E1, October 3, 2008 Email; App. Ex. 6, Deposition of Cathleen Senko ("Senko Depo."), a true and correct copy of which is attached to the Appendix at Exhibit 6, pp. 45:21-48:24; Deposition of Katherine D. Rhea ("Rhea Depo."), pp. 169:9-171:13, a true and correct copy of which is attached to the Appendix as Exhibit 8.) The fees of $225,708.13 was comprised of 35% of

Velocity's network access fees ($83,208.13); 90% of the food and beverage revenue minimums[6] that **could be** assessed by Morton's and Maggiano's in the event of a cancellation ($134,000); and 100% of the food and beverage deposits that would have been due had a contract been signed ($23,750), less certain deposits already paid ($15,250)[7]. Elias clearly approved of this extortion plan, because an email with identical figures was sent to Celerity. (App. Ex. 6, Senko Depo., pp. 50:13-51:22; App. Ex. 6.F, October 3, 2008, p. 2.) If MMEG agreed to reschedule the December 2, 2008 broadcast before March 31, 2009 **and** pay the full cost of the broadcast before the end of 2008, Velocity offered not to impose similar cancellation fees for that postponement. (App. Ex. 6.F, October 14, 2008 Email) If the broadcasts did not occur on or before the agreed-upon dates, however, MMEG ran the risk of forfeiting the full cost of both broadcasts.

For the next month Celerity attempted to convince MMEG to meet Velocity's demands that it reschedule the broadcasts on or before January 31 and March 31, 2009, respectively, and pay the full cost of both broadcasts before the end of 2008. Not surprisingly, MMEG was reluctant to put almost a million dollars at risk without knowing when FDA approval would be obtained and whether the broadcasts could be completed by January 31 and March 31, 2009, respectively.

After Velocity learned that MMEG was unwilling to commit to rescheduling without FDA approval, it sent Celerity invoices assessing cancellation fees for the October 28, 2008 and December 2, 2008 broadcasts. The invoices totaled $225,708.13 and $228,093.13, respectively,

---

[6] Morton's and Maggiano's established minimum amounts that would have to be spent on food and beverage in connection with the use of a particular boardroom. Each restaurant had the ability to recover these food and beverage minimums in the event of a late cancellation.

[7] In other words, Velocity was attempting to charge Celerity the full amount of the food and beverage minimums for each boardroom (90% of the minimums plus the 10% deposit, equals 100%).

and were comprised of 35% of Velocity's network access fees; 90% of the food and beverage revenue minimums and 100% of the food and beverage deposits less deposits already paid. (App. Ex. 6, Senko Depo., pp. 51:25-52:13; App. Ex. 6.G, December 2, 2008 Email Enclosing Invoices.)

### 6. Velocity Did Not Incur the Costs It Was Attempting to Recover From Celerity

There is no evidence that Morton's or Maggiano's actually charged **any** food and beverage revenue minimums for the planned Effient Broadcasts. A representative of Morton's confirmed that no revenue minimums were ever charged to Velocity in 2008 or otherwise for any cancelled or postponed broadcasts. (Deposition of Ronald M. Dinella ("Dinella Depo."), a true and correct copy of which is attached to the Appendix as Exhibit 3, pp. 43:2-47:3, 58:24-60: 12; App. Ex. 2, Elias Depo., pp. 154:17-155:6.) This is also confirmed by an email and invoice from Morton's to Velocity indicating that Morton's only expected to retain the room deposits of $250.00 per location. (App. Ex. 6, Senko Depo., pp. 35:5-38:22; App. Ex. 6.C, Email dated September 24, 2008 attaching Morton's Invoice.) Likewise, an email from Maggiano's confirmed that no food and beverage revenue minimums were imposed as a result of these postponements. (App. Ex. 6, Senko Depo., pp. 38:12-41:15; App. Ex. 6.D, November 3, 2008 Email and Invoice from Maggiano's.). Specifically, on November 3, 2008, Maggiano's sent Velocity an invoice for $5,250.00 for "cancellation" of the Effient broadcast, an amount that, like Morton's invoice, constituted the forfeiture of the $250.00 deposits necessary to reserve rooms at each restaurant location hosting a broadcast. (*Id.*)

Nor is there any evidence Velocity performed any services, or lost any opportunities, that would justify its assessing 35% of its network access fees. (App. Ex. 13, Janson Depo., pp.

91:20-93:21; App. Ex. 5, Esswein Depo., pp. 143:24-146:25; App. Ex. 9, Deposition of Kimberly A. Bryant ("Bryant Depo."), a true and correct copy of which is attached to the Appendix as Exhibit 9, pp. 48: 11-18, 52:4-7.) Indeed, the only services Velocity could identify as providing were in reference to reserving the studio and satellite time for the proposed dates. However, no work or hard costs were identified. (App. Ex. 5, Esswein Depo., pp. 143:24-146:25; App. Ex. 2, Elias Depo., pp. 398:1-400:5; Deposition of Elizabeth Surgil ("Surgil Depo."), a true and correct copy of which is attached hereto as Exhibit 7, pp. 23:17-27:3; 52:8-53:9; App. Ex. 9, Bryant Depo., pp. 48:11-18, 52:4-7.)

**7. Velocity's Assessment Of Cancellation Fees Was Inconsistent With Its Own Policies and the Parties' Course of Dealing**

There was absolutely no precedent for Velocity's attempt to assess cancellation fees for a broadcast that was never under contract in the first place, and merely had been postponed rather than cancelled. Velocity's own standard payment terms do not require an initial payment be made until a contract is executed. (App. Ex. 6, Senko Depo., pp. 21:11-24:17; App. Ex. 6.A, February 4, 2008 Velocity Invoice.) Notably, Velocity initially invoiced Celerity for the first broadcast on July 21, 2008. When Celerity inquired as to why it was being invoiced for a broadcast that was not under contract, Velocity clearly explained that "payment is not due until the contract is executed," regardless of when the invoice is sent. (App. Ex. 6, Senko Depo., pp. 30:7-35:3; App. Ex. 6.B, July 21, 2008 Email.)[8]

Moreover, when Velocity terminated the Reseller Agreement in September 2009, it ignored the fact that Celerity had broadcasts scheduled with contracts pending execution and

[8] The July 21, 2008 email refers to the October 28, 2008 broadcast as Daiichi Sankyo Prasugrel Broadcast because the drug Effient was previously called Prasugrel. (App. Ex. 12, Gatzulis Depo., p. 221.)

stated that only "broadcasts that have been hard-booked pursuant to a signed customer agreement will be honored." (App. Ex. 2.H, September 3, 2009 Letter.)[9] These examples reiterate that it is and always has been Velocity's policy that a broadcast is not booked unless a contract has been executed.

And this is precisely the policy Velocity follows today. Velocity recently told one of Celerity's former customers that Velocity does not consider a broadcast to be a "firm broadcast" if "we do not have a contract with them." Therefore, "no deposits should be charged" in the event that the broadcast does not go forward. (App. Ex. 5.A, Ex. 93, Email Chain dated September 8-9, 2009; App. Ex. 6, Senko Depo., p. 34:4-9.)

Velocity's transfer of deposits for rescheduled broadcasts is also consistent with its policy in the past. On a number of other broadcasts, including the initial postponement of the first Effient broadcast, Velocity simply approved a transfer of deposits to the new date. (App. Ex. 8, Rhea Depo., pp. 109:4-109:9-24, 117:4-120:4; App. Ex. 6, Senko Depo., pp. 51:13-22.) And today, as Velocity continues to do business with Celerity's former customers, Velocity follows the same policy. It told one potential customer that "if you need to move your date, we do not charge any penalty for either VELOCITY production costs or F&B minimums." (App. Ex. 5.B, Email chain dated May 24, 2010.) Further: "[w]e have had other pharma need to move their date due to FDA approval delays – and again, in this instance we do not charge any cancellation

---

9 The term "hard-booked" is found nowhere in the Reseller Agreement, and is not even commonly understood within Velocity. (App. Ex. 5, Esswein Depo., pp. 20:25-22:22; App. Ex. 8, Rhea Depo., pp. 24:24-34:10; App. Ex. 6, Senko Depo., p. 41:17-42:21; App. Ex. 7, Surgil Depo., pp. 27:4-30:12; App. Ex. 9, Bryant Depo., p. 53:11-16; Deposition of Peg McGowan ("McGowan Depo."), a true and correct copy of which is attached to the Appendix as Exhibit 10, pp. 88:17-89:5; Deposition of Roesemary Mendel ("Mendel Depo."), a true and correct copy of which is attached to the Appendix as Exhibit 11, p. 15:13-24.)

either on production or F&B minimums." (*Id.*) In another communication, Velocity indicated that it would be "lenient knowing [client] would possibly need to move their dates". (*Id.*, p. 1.)

Unbelievably, Elias claims that Velocity consistently applied its cancellation policies in seeking more than half a million dollars from Celerity. (App. Ex. 2, Elias Depo., p. 156:1-8.) Others within Velocity were more candid in admitting that Velocity's "policy" was applied on a case-by-case basis. (App. Ex. 6.H, Email chain dated January 15-26, 2009 attaching invoices dated January 26, 2009; App. Ex. 8, Rhea Depo., pp. 109:4-109:9-24,202:8-204:18.)

Celerity has no issue with the enforceability of the cancellation provisions included in a signed Customer Agreement. In one instance a broadcast for a company known as Sepracor, for a product named Brovana, was cancelled due to internal budget cuts. This cancellation occurred after Sepracor had executed and signed a Customer Agreement. When it invoiced Celerity for those cancellation fees, Velocity stated that because the cancellation was due to a budget issue and not a delay in FDA approval, the "standard" cancellation policy would apply. (App. Ex. 5, Senko Depo., pp. 60:18-64:20; App. Ex. 5.H, Email chain dated January 15-26, 2009 attaching invoices dated January 26, 2009, p. 3; App. Ex. 13, Janson Depo., pp. 48:14-50:14; App. Ex. 13.A, Brovana Invoice for Cancellation Fees; App. Ex. 8, Rhea Depo., pp. 71-74, 108:5-109:25, 117:4-120:4.) In that instance, Celerity paid the cancellation fees as required, without objection. (App. Ex. 13, Janson Depo., pp. 48:14-50:14, 61:11-25; 62:18-24.) It is therefore abundantly clear that Velocity does not charge cancellation fees for a broadcast not under contract – unless Celerity is involved.

**C. The Parties' Joint Marketing Efforts**

In the Reseller Agreement, Velocity granted Celerity a license to use its service marks:

> Solely for the purpose of the marketing activities described in section II.C above, Velocity hereby grants to Reseller the limited, non-exclusive right and license to use Velocity's trademarks and services marks strictly in accordance with the guidelines for such usage provided by Velocity to Reseller from time to time.

(App. Ex. 1, Reseller Agreement, Section II.F.) The record is unclear as to whether Celerity received any usage "guidelines" until July of 2009, almost two years after the Reseller Agreement was executed. (App. Ex. 12, Gatzulis Depo., pp. 116:2-122:4.) Regardless, most of the marketing materials used by Celerity were created by Velocity. (App. Ex. 12, Gatzulis Depo., pp. 122:22-123:25; App. Ex. 13, Janson Depo., pp. 298:17-301:12; App. Ex. 2, Elias Depo., pp. 116:14-122:7; App. Ex. 2.B, Marketing Materials.) Many of Velocity's own materials used the phrase "Velocity-Celerity" to refer to the services Velocity and Celerity jointly provided to Celerity's customers. (App. Ex. 2, Elias Depo., pp. 82:7-10; 116:14-122:15; App. Ex. 2.A, Marketing Materials.) And at least one of Velocity's marketing documents used "Celerity-Velocity," the very phrase that Elias now contends is a violation of Celerity's limited license and false advertising in violation of the Lanham Act. (App. Ex. 2, Elias Depo., pp. 132:25-134:23; App. Ex. 2.D, Velocity Overview.)

When the parties first began their relationship, however, Celerity needed something more succinct than simply a power point presentation or "leave-behind" brochure to provide to potential clients. (App. Ex. 13, Janson Depo., pp. 298:16-301:12.) Thus, Celerity created a document titled "Celerity Healthcare Solutions Overview" to describe what Celerity did together with Velocity. Velocity's then-President, Russell Rice, reviewed and approved the document

and Velocity was well aware that it was provided to potential customers from time-to-time. Indeed, a copy of the documents was produced by Velocity in this litigation. (App. Ex. 2.D, Celerity Healthcare Solutions Overview.)

Once Elias decided to rid himself of Celerity, he decided for the first time that the innocuous phrase "Celerity-Velocity" was objectionable and inconsistent with his brand guidelines. On December 22, 2008, Elias' counsel sent a letter to Celerity's counsel (the "Cease and Desist Letter") alleging that Celerity's use of Velocity's marks had exceeded the limited license granted by the Reseller Agreement. (App. Ex. 12.A, December 22, 2008 Cease and Desist Letter.) In the Cease and Desist Letter, Velocity described the infringing conduct as the usage of the phrases "Celerity-Velocity solution" and "Celerity-Velocity HD Suites." (*Id.*) Although Celerity was no longer actively relying on the "Celerity Healthcare Solutions Overview" at that time, it appears that the document was sent to perhaps three potential customers after the date of the Cease and Desist Letter.

**D. Elias' Termination of the Reseller Agreement**

After filing these consolidated lawsuits, Elias eventually caused Velocity to terminate the Reseller Agreement on September 2, 2009, a full year before it was set to expire by its terms. (App. Ex. 13.B, September 2, 2009 Letter; App. Ex. 1, Reseller Agreement, Sec. I.) The letter advising Celerity of Velocity's termination of the Reseller Agreement recognized that the Reseller Agreement did not expire until September of 2010, but claimed that Celerity's refusal to pay the cancellation fees and its alleged misuse of Velocity's marks were material breaches of the Reseller Agreement that entitled Velocity to terminate the agreement before the end of its stated term. (App. Ex. 13.B, September 2, 2009 Letter.)

The next day, Elias embarked on a concerted effort to take Celerity's business for himself. He first sent a letter to dozens of Celerity's actual and prospective customers and strategic partners, stating that Velocity was no longer partnering with Celerity. (App. Ex. 2.H, September 3, 2009 Solicitation Letter.) Not only did Mr. Elias tell Celerity's clients that Celerity was out of the Velocity business, he essentially told them that Celerity was out of the broadcasting business altogether. (*Id.*) The letter stated that Celerity was legally obligated not to "sell, market, promote, license or otherwise represent private broadcasts, via satellite, internet or other similar broadcast media, into restaurant or other hospitality venues until September 2, 2010." (*Id.*.) The letter also advised these customers that they need not worry because Velocity's representatives would be contacting them soon. (*Id.*) The September 3, 2009 Solicitation Letter to Celerity's customers was the death knell for Celerity. Not only did it deprive Celerity of its core business (*i.e.*, selling Velocity broadcasts), but it put Celerity out of business altogether by causing its clients to fear the prospect of litigation if they continued to do business with Celerity.

**STANDARD OF REVIEW**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Celotex*, 477 U.S. at 323. The moving party can meet this burden either by presenting evidence showing there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322-324.

A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson*, 477 U.S. at 248.

Once the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the nonmoving party must set forth specific facts showing a genuine issue for trial and may not

rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). Where the record taken as a whole cannot lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial" and the entry of summary judgment is appropriate. *Matsushita Elec.*, 475 U.S. at 587.

**LEGAL ARGUMENT**

**A. VELOCITY IS NOT ENTITLED TO RECOVER CANCELLATION FEES FROM CELERITY**

Velocity claims that Celerity is somehow obligated to pay more than half a million dollars in "cancellation" fees for two broadcasts that were anticipated, but never under contract. Celerity is entitled to summary judgment on that claim for three reasons. First, nothing in the Reseller Agreement requires Celerity to pay cancellation fees. Second, the contract that does contain provisions assessing cancellation fees, the Customer Agreement, was never executed. Third, even if Velocity were entitled to assess cancellation charges under these facts, the fees charged have no relationship to any damage Velocity actually suffered and are so exorbitant as to constitute an unconscionable penalty.

**1. There is no contractual basis for assessing cancellation fees in the absence of a signed Customer Agreement.**

Because it is indisputable that no contract containing cancellation penalties had been executed, Velocity is forced to argue that the fees are due because the broadcasts at issue were "firm-booked" or "hard-booked," two terms that appear nowhere in the Reseller Agreement. Any contention that Celerity owes over half a million dollars in "cancellation" fees simply because two broadcasts were placed on a calendar is belied by the terms of the Reseller Agreement, Velocity's own admissions and the parties' prior course of dealing.

"Pennsylvania contract law begins with the firmly settled point that the intent of the parties to a written contract is contained in the writing itself." *Amerisourcebergen Drug Corp. v. Meier*, C.A. No. 03-CV-6769, 2004 U.S. Dist. LEXIS 25243, *9 (E.D. Pa. Dec. 14, 2004)(citing *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 92 (3d Cir. 2001)). If the terms are "clear and unambiguous, construction of the contract is a question of law for the Court." *Id.* at *10 (citing *Bohler-Uddeholm* at 92-93).

Nothing in the Reseller Agreement states that fees are owed if a potential broadcast is scheduled and then postponed, or even cancelled. Indeed, the Reseller Agreement says just the opposite. Section II.C of the Reseller Agreement states that Velocity had no obligation to provide any "Velocity Services" until a Customer entered into a valid written Customer Agreement with Celerity:

> Velocity will provide Velocity Services to Customers who have entered into a valid Customer Agreement with Reseller pursuant to section II.B above, and for which Velocity has received payment from Reseller in accordance with Velocity's standard payment terms.

(App. Ex. 1, Reseller Agreement, Sec. II.C.) Moreover, the provision entitled "fees and payments" states:

> Reseller will pay Velocity the fees set forth in Velocity's then-current Rate Cards for Velocity's Services ("Fees") and will use its best efforts to do so in accordance with Velocity's standard payment terms as set forth therein for each broadcast that Reseller **sells** to a Customer.

(App. Ex. 1, Reseller Agreement, Sec. III.A., emphasis added.)

It is undisputed that none of these requirements had been met at the time the cancellation fees were assessed. Celerity had not entered into a written Customer Agreement with MMEG and Velocity had not received payment (other than the room deposits) from Celerity for the

Velocity Services to be provided to MMEG. (App. Ex. 13, Janson Depo., pp. 86:6-10; 89:3-13.) Because these two broadcasts were merely contemplated and had not been "sold," there is no contractual basis for assessing cancellation fees.

To the extent the Reseller Agreement is at all ambiguous on this point, there is ample extrinsic evidence to confirm that both Velocity and Celerity understood that a broadcast was not "booked" until a contract had been signed and payment made.[10] For example, in July of 2008 Velocity invoiced Celerity for the first Effient broadcast before a Customer Agreement had been executed. When Celerity inquired as to why it was being invoiced for fees before the broadcast had been sold, Velocity advised that "payment is not due until the contract is executed regardless of how early we send our invoice." (App. Ex. 6.B, July 21, 2008 Email.) Similarly, in an email dated September 19, 2008 discussing one of the Effient Broadcasts, Susie Franklin of Velocity asked Elias: "Isn't that date free – if we don't have payment?" (App. Ex. 2.F, September 19, 2008 Email.)

Indeed, this is the same position Velocity took when it terminated the Reseller Agreement in September of 2009. Knowing that Celerity was close to executing Customer Agreements for several broadcasts, but had not yet done so, Velocity indicated that only "broadcasts that have been hard-booked pursuant to a signed customer agreement will be honored." (App. Ex. 12B.A,

---

[10] Where contract terms are ambiguous or the parties' intent unclear, extrinsic evidence is admissible to prove the intent of the parties. *Bohler-Uddeholm*, 247 F.3d at 92-93; see *Prusky v. Prudential Ins. Co.*, C.A. No. 00-2783, 2001 U.S. Dist. LEXIS 24080, *71-*74 (E.D. Pa. Oct. 30, 2001)(In interpreting contract language, the court looked to the objective manifestations of the intent of the parties involved in negotiation of the contract. "When a contract, because of ambiguity or otherwise, requires interpretation, the court will as far as possible put itself in the position of the parties at the time the contract was made to ascertain its sense and meaning." 1 P.L.E. Contracts §146 (2004), citing *Coal & Delivery Co. v. Howard*, 265 F. 566, 568 (3d Cir. 1920).

September 2, 2009 Letter). The term "hard-booked" is found nowhere in the Reseller Agreement, and is not even commonly understood within Velocity. (App. Ex. 5, Esswein Depo., pp. 20:25-22:22; App. Ex. 8, Rhea Depo., pp. 24:24-34:10; App. Ex. 6, Senko Depo., pp. 41:17-42:21; App. Ex. 7, Surgil Depo., pp. 27:4-30:12; App. Ex. 9, Bryant Depo., pp. 53:11-53:16; McGowan Depo., pp. 88:17-89:5; Mendel Depo, pp. 15:13-24.) Nonetheless, Velocity's position was clear: a broadcast was not sold until a contract was signed.

Even today, Velocity does not consider a broadcast to be sold until a contract is executed. Velocity recently advised a potential customer in Celerity's former exclusive market that Velocity does not consider a broadcast to be a "firm broadcast" if "we do not have a contract with them." Therefore, "no deposits should be charged." (App. Ex. 5.A, Email Chain dated November 19, 2008.) Velocity also advised a potential customer that "if you need to move your date, we do not charge any penalty for either VELOCITY production costs or F&B minimums." (App. Ex. 5.B, Email Chain dated May 24, 2010.) Further: "[w]e have had other pharma need to move their date due to FDA approval delays – and again, in this instance we do not charge any cancellation either on production or F&B minimums." (*Id.*)

All of this is consistent with the parties' prior course of conduct. As discussed in the factual background section, above, Velocity agreed to transfer the room deposits the first time the Effient broadcast was postponed due to delays in FDA approval. The *only* time Velocity took the position that these exorbitant fees were due for a broadcast that was merely postponed (let alone not even under contract) was with respect to the Effient Broadcasts, at a time when the parties' relationship had deteriorated to the point that Elias seized every opportunity to make

Celerity want to walk away from the multi-million dollar business it had built with Velocity. Unfortunately for Mr. Elias, Celerity was not willing to do so.

**2. Velocity cannot be a third party beneficiary to a contract that does not exist.**

The only contract that provides a basis for assessing these cancellation fees is the form Customer Agreement that Celerity is supposed to enter into with its customers, and to which Velocity is to be made an intended third party beneficiary. (App. Ex. 1, Reseller Agreement, Sec. II.B.) The Customer Agreement, if executed, obligates the customer to pay certain cancellation fees depending on the timing of the cancellation. (*Id.*, Ex. B, Sec. 4.) This makes perfect sense, as the concept of a cancellation fee is not applicable until there is something that can be cancelled. Without a contract, there is no broadcast and, consequently, no reason to assess a "cancellation" fee.

This does not mean Velocity is without a remedy. Velocity has established a confirmation policy that requires the payment of a nonrefundable deposit of $250 per location in order to "hold" the locations on the date of a proposed broadcast. (App. Ex. 1, Reseller Agreement, Ex. C, Sample Reservation Confirmation.) If these deposits have been paid and a date is on hold, but the broadcast does not go forward as planned, the room deposits are forfeited regardless of whether a contract has been signed. Rather than adhere to its own clear policies, Velocity chose to make a frivolous claim for more than half a million dollars in "cancellation" fees for two broadcasts that were never under contract.

In cases where a Customer Agreement has been executed, Velocity is to be considered an intended third party beneficiary and may be entitled to enforce the terms of the contract. But it is obvious that Velocity cannot be a third party beneficiary of a contract that does not exist. To

succeed under its theory, Velocity must demonstrate that there was a valid, enforceable contract between Celerity and MMEG for which Velocity was a Velocity a third party beneficiary.

Under Pennsylvania law, the party asserting the validity of a contract bears the burden of proof. *Chainey v. Street*, 523 F.3d (3d Cir. 2008).

> [A] party becomes a third party beneficiary only where both parties to the contract express an intention to benefit the third party in the contract itself ... unless the circumstances are so compelling that recognition of the beneficiary's right is appropriate to effectuate the intention of the parties, and the performance satisfies an obligation of the promisee to pay money to the beneficiary or the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

*Scarpitti v. Weborg*, 530 Pa. 366, 370, 609 A.2d 147 at 150–51 (1992) (emphasis added). Inherent in any contention that a party is a third party beneficiary of an agreement is the requirement that there be an actual and enforceable agreement evidencing that intent. *Hahnemann Medical College and Hospital of Philadelphia v. Hubbard*, 406 A.2d 1120, 1122 267 Pa. Super. 436, 440 (1979) (for an agreement to exist, there must be a "meeting of the minds"; "the very essence of an agreement is that the parties mutually assent to do the same thing and without such assent there can be no enforceable agreement"). The principle that a contract is not binding unless there is an offer and an acceptance is to ensure that there will be mutual assent. *Id.* (*citing Farren v. McNulty*, 277 Pa. 279, 121 A. 501 (1923)).

Therefore, Velocity is not entitled to enforce the cancellation provisions of an unexecuted Customer Agreement and its claims lack any contractual support whatsoever.

**3. Velocity suffered no damages and the fees assessed are an unconscionable penalty.**

Even assuming Velocity had some basis for attempting to assess these exorbitant fees, Pennsylvania law would not grant it such a windfall. Velocity seeks to recover 35% of its own

broadcast fees (known as "network access fees") despite the fact that the only thing it ever did was place a hold on the rooms and the studio space. More galling is Velocity's attempt to recover 100% of the food and beverage revenue minimums that Morton's and Maggiano's were entitled to charge in the event of a cancellation, but indisputably *did not charge* in this instance.

Velocity's attempt to impose these cancellation fees is no more than an attempt to enforce a liquidated damages provision. It is well-settled that, under Pennsylvania law, the parties to a contract may agree to liquidate their damages, but only to the extent the amount is reasonable in light of the anticipated actual loss and the difficulties associated with proof of the amount of the actual loss. *Brinich v. Jenka*, 2000 Pa. Super. 209, 757 A.2d 388, 402 (2000). Importantly, the parties' agreement to liquidate their damages, must not disregard principles of compensation. *See Hanrahan v. Audobon Builder, Inc.*, 418 Pa. Super. 497, 501-02, 614 A.2d 748, 750 (1992). The primary objective of contract remedies is to compensate the non-breaching party, **not to punish the breaching party**. *Id.* Thus, a contract remedy that acts as a penalty, as opposed to compensation for damages, is unenforceable on grounds of public policy. *Id.*

Whether a stipulated sum for liquidated damages is a penalty is a question of law, which must be determined on the facts and circumstances of each case. *Hanrahan*, 614 A.2d at 751 (*quoting Holt's Cigar Co. v. 222 Liberty Assoc.*, 404 Pa. Super. 578, 586-88, 591 A.2d 743, 747-48 (1991)); *see also A.G. Cullen Constr., Inc. v. State Sys. of Higher Educ.*, 898 A.2d 1145, 1163-64 (Pa. Commw. Ct. 2006) ("in determining whether a liquidated damages clause is an unenforceable penalty**,** one must examine the entire contract in light of its text, what it is about, the parties' intentions, and the facility of measuring damages or lack thereof, so as to arrive at an equitable conclusion"). *See also Holt's Cigar Co. v. 222 Liberty Assoc*., 404 Pa. Super at 587-87,

591 A.2d at 747-48 (holding that a liquidated damages per diem amount was not a reasonable forecast of anticipated damages due to delay, and acted solely as an unenforceable penalty to discourage breach or delay).

There is no question that the cancellation fees that Velocity seeks to impose are an unreasonable penalty because they are wholly unrelated to any loss actually incurred. First, there is absolutely no evidence that Morton's or Maggiano's actually charged Velocity food and beverage revenue minimums for the Effient Broadcasts. A representative of Morton's confirmed that no revenue minimums were ever charged to Velocity in 2008 or otherwise for any cancelled or postponed broadcasts and Morton's invoice to Velocity confirms that only room deposits, not revenue minimums were charged. (App. Ex. 3, Dinella Depo., pp. 43:2 – 47:3, 58:24-60: 12; App. Ex. 6.C, Email Chain dated July 21, 2008 attaching email dated July 30, 2008.) The same is true for Maggiano's, no revenue minimums were charged; only the room deposits. (App. Ex. 6.I, Email dated September 3, 2009.)

Velocity's attempt to recover 35% of its own fees is equally unreasonable. No Customer Agreement with MMEG was ever executed and there is no evidence that Velocity actually performed any services related to the Effient broadcasts. (App. Ex. 9, Bryant Depo., pp. 48:11-18, pp. 52;4-7.) Because it has incurred no damages and has no contractual right to receive any money, the only conclusion that can be reached is that Velocity is looking to impose a penalty on Celerity and receive a windfall of almost $800,000. Celerity requests the Court deny Velocity this windfall and grant Celerity summary judgment on this issue.

## B. VELOCITY CANNOT PROVE A VIOLATION OF THE LANHAM ACT

Velocity's claim that Celerity has violated the Lanham Act fails for two reasons. First, Velocity consented to the use of the marketing materials in question and granted Celerity an implied, and later an express, license to use Velocity's marks. Its subsequent revocation of that consent was not motivated by any commercial harm; it was purely motivated by Elias' desire to cause Celerity to abandon its multi-million dollar business. Second, the record does not provide support for the essential elements of a Lanham Act claim. In particular, Velocity cannot establish that any customer was confused or misled by the use of the term "Celerity-Velocity," and it cannot establish that it was damaged as a result of the alleged infringement. In reality, the marketing materials that Velocity now claims are misleading laid the foundation for an extremely successful venture, one that earned Velocity millions of dollars in revenues.

### 1. Velocity's claims fail as a matter of law because Velocity consented to Celerity's use of its service marks.

a. Velocity granted an implied license to Celerity

As an initial matter, Plaintiff's service mark infringement claims[11] fail because Velocity consented to Celerity's use of its service marks and therefore granted an implied license to Celerity. At the inception of the parties' relationship, they jointly developed the very marketing materials that Velocity now claims are deceptive and misleading, and Velocity was well aware that Celerity provided the document to potential customers from time-to-time.

[11] Velocity brought claims against Celerity under § 1125(a)(1) and § 1125(c) of the Lanham Act. Velocity's claim under § 1125(c) solely requests injunctive relief. (Complaint, No. 151, [Docket No. 1] ¶¶ 70, 71.) Because Velocity terminated the Reseller Agreement on September 2, 2009, Celerity has no reason to distribute marketing materials advertising a reseller relationship that does not exist. Consequently, Velocity's claims for injunctive relief are moot.

Although Velocity had not yet granted Celerity an express license to use its marks at the time this documents was first utilized, the law also recognizes implied licenses. "An implied license in fact 'arises out of the objective conduct of the parties, which a reasonable person would regard as indicating that an agreement has been reached.'" *Villanova Univ. v. Villanova Alumni Educ. Found.*, 123 F. Supp. 2d 293, 307 (E.D.Pa. 2000) (citing *Birthright v. Birthright, Inc.*, 827 F. Supp. 1114, 1134 (D.N.J. 1993)). Therefore, "[p]ermission to use the trademarks coupled with the exercise of reasonable control over such use can lead to the conclusion that an implied license existed between the parties, even where no contract was made." *Villanova Univ.*, 123 F. Supp. 2d at 307. *See also*, *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 140 n.7 (3rd Cir. 1981) (noting "the district court found as facts that state and local chapters affiliated with the United States Jaycees were permitted during the term of affiliation to use the National's trade and service marks. Thus some type of license agreement existed.")

As the evidence of record in this case shows, Velocity's role in the development of the "Celerity Healthcare Solutions Overview" and its consent to Celerity's use of that document establish an implied license that bars Velocity's claims under the Lanham Act.

b. <u>Velocity granted an express license to Celerity</u>

When the parties entered into the Reseller Agreement, Velocity expressly granted Celerity a license to use Velocity's service marks in connection with the joint marketing efforts contemplated by the Reseller Agreement. Section II F of the Reseller Agreement states in pertinent part:

> Solely for the purpose of the marketing activities described in section II.C above, Velocity hereby grants to Reseller the limited, non-exclusive right and license to use Velocity's trademarks and

> services marks strictly in accordance with the guidelines for such usage provided by Velocity to Reseller from time to time.

(App. Ex. 1, Reseller Agreement, Sec. II.F.)

Although the Reseller Agreement was effective as of October 2007, no one from Celerity recalls receiving any "guidelines" from Velocity. This is not surprising, as most of the marketing materials that Celerity provided to potential customers were developed by Velocity. App. Ex. 12, Gatzulis Depo., pp. 122:22-123:25; App. Ex. 13, Janson Depo., pp. 298:17-301:12; App. Ex. 2, Elias Depo., pp. 116:14-122:7; App. Ex. 2.B, Marketing Materials.) If anything, the marketing materials that Velocity produced are the best evidence of what was a permissible use of Velocity's marks. In a memo dated January 7, 2008, Velocity refers to the "Celerity-Velocity" solution. (App. Ex. 2.D, January 7, 2008 Memo) In other marketing materials created by Velocity, Velocity refers to a "Velocity/Celerity Experience" and repeatedly refers to both Velocity and Celerity throughout the materials. (App. Ex. 2.B, Marketing Materials; App. Ex. 2, Elias Depo., pp. 116:14-122:7.) Therefore, it is clear that Velocity had no objection to the pairing of Velocity and Celerity's name together, but takes issue only with the placement of Celerity's name before Velocity's.[12]

By definition a party who holds a valid license to use a trademark and is not in breach of the license cannot be an infringer of the licensed mark." J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:40 (4th ed. 2002).

---

[12] To the extent this could be construed as an infringing use, Celerity's use was permissible under the implied and express licenses discussed above. In December of 2008, Velocity decided that this usage was not an infringement and requested that Celerity cease using the overview document. After that, the infringing materials were provided to at most *three* customers. (*See* App. Ex. 12, Gatzulis Depo., pp. 133-36; App. Ex. 2.A, Plaintiff's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 13.)

Thus "[w]here a trademark holder has authorized another to use its mark, there can be no likelihood of confusion and no violation of the Lanham act if the alleged infringer uses the mark as authorized." *Segal v. Geisha NYC LLC*, 517 F.3d 501, 506 (7th Cir. 2008). "Every license carries with it a waiver of the right of the trademark owner to sue for infringement arising out acts that fall within the scope of the license." MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:40. *Stanfield v Osborne Indus.*, 839 F Supp. 1499 (D.C. Kan. 1993), *aff'd*, 52 F3d 867 (10th Cir. 1995), *cert denied*, 516 U.S. 920 (1995) ("Previous license granting defendants' rights to use and register plaintiff's surname and control quality of goods sold under name constitutes defense against plaintiff's suit for unfair competition so that summary judgment is granted to defendants.").

**2. Velocity cannot establish the essential elements of a claim false advertising under 15 U.S.C. § 1125(a)(1).**

Preliminarily, it is important to attempt to discern the nature of the infringement alleged by Velocity. While the Complaint does not clearly identify the allegedly infringing conduct, in its Answers to Defendant's First Set of Interrogatories Velocity stated that its claims are based on the fact that "Celerity produced and distributed an 'overview' of Celerity Healthcare Solutions, Inc., in which Celerity exceeded the scope of the limited license it had been granted... ." (App. Ex. 2.A, Plaintiff's Answers to Defendant's First Set of Interrogatories, Interrogatory No. 13.) Specifically, Velocity identified the following conduct as the basis for its claims:

- By referring to "Celerity-Velocity HD Suites, housed within Mort's and Maggiano's Private Boardrooms["] [sic];
- By referring to the "The Celerity-Velocity solution"; and
- By using the term "Celerity-Velocity broadcast."

(*Id.*)

Thus, Velocity contends that Celerity engaged in false advertising based solely on Celerity's placement of the word "Celerity" directly *before* the word "Velocity." (App. Ex. 2, Elias Depo., pp. 165:18-167:8.) It defies logic to suggest that a potential customer could be confused by the use of the term "Celerity-Velocity" as opposed to "Velocity-Celerity." This mere juxtaposition does not constitute false advertising under § 1125(a)(1)(a) of the Lanham Act.

Pursuant to § 1125(a)(1)(A), an action for trademark infringement lies against:

> (1) Any person who, on or in connection with any goods or services, . . ., uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person... .

15 U.S.C. § 1125(a)(1).[13]

To establish a Lanham Act claim based on a false or misleading representation of fact, Velocity must show:

> 1) that the defendant has made false or misleading statements as to his own product [or another's];
>
> 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;

[13] It is unclear from the Complaint whether Plaintiff's Claim for trademark infringement under § 1125(a)(1) is being asserted under subsection (A) or (B). However, it appears that Plaintiff is asserting a claim under subsection (A) based on its allegation that "Celerity has infringed Velocity's service marks in interstate commerce by various acts set forth above, in a manner that **has confused or is likely to confuse consumers**." (Complaint, No. 151, [Docket No. 1] ¶ 56.)

3) that the deception is material in that it is likely to influence purchasing decisions;

4) that the advertised goods traveled in interstate commerce; and

5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will, etc.

*Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, Inc.*, 19 F.3d 125, 129 (3d Cir. 1994) (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922-23 (3d Cir. 1990)).

Velocity cannot establish four of the five elements necessary to prove infringement. First, there is no evidence of record to show that Celerity has made any false or misleading statements as to Velocity's product. Liability for false advertising arises if the commercial message or statement is either: (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers. *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co.*, 290 F.3d 578, 586 (3d Cir. 2002) (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir. 1993 ) ("a plaintiff must prove either literal falsity or consumer confusion, but not both")). Certainly, the placement of "Celerity" directly before "Velocity" is not a literally false statement. Nor is it at all ambiguous. Both entities are affiliated with the services being advertised because Celerity was the designated reseller of Velocity's services, and Celerity provided services to its customers in addition to the services provided by Velocity. The two entities were partners, not competitors.

Second, there is no actual deception or even a tendency to deceive a substantial portion of the intended audience. It is not as if Celerity omitted any reference to Velocity or attempted to convince customers that Celerity handled the production and broadcasting end of the business.

Velocity has never articulated, and indeed it is impossible to imagine, how the placement of "Celerity" directly before "Velocity" could deceive a customer. Further, if Velocity found this formulation confusing, it certainly would not have used the phrases "Celerity-Velocity" and "Velocity-Celerity" in its own marketing materials. In the trademark context, if the record contains no evidence of actual confusion between the parties' marks, this Court can conclude that "no likelihood of confusion exists as a matter of law" and enter summary judgment on that basis. *World Wrestling Federation Entertainment, Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 424 (W.D.Pa. 2003). *See also Murray v. Cable National Broadcasting Co.*, 86 F.3d 858, 860 (9th Cir. 1996); *Lawrence Music, Inc. v. Samick Music Corp.*, C.A. No. 01-1029, slip op. (W.D.Pa., decided Nov. 17, 2004), available at 2004 U.S.Dist.LEXIS 28217; *Bijur Lubricating Corp. v. Devco Corp.*, 332 F. Supp. 2d 722, 727 (D.N.J. 2004).

The third requirement that Velocity fails to establish is materiality as it must show that the infringing use is likely to influence purchasing decisions. In the typical case, this would mean making a showing that the infringing use caused consumers to shift their business to the infringer to the detriment of the infringed. In this case, if the alleged infringement was material it would only have caused consumers to direct more business *to Velocity*.

The fifth element requires a likelihood of injury to Velocity, and the record is devoid of any such proof. It is this element that demonstrates the frivolity of Elias' objection to the phrase "Celerity-Velocity." There is no evidence of record showing that Velocity lost sales as a result of Celerity's use of the phrase "Celerity-Velocity." In fact, given that the materials in question were developed very early in the parties' relationship, and the fact that Celerity was responsible for as much as 80% of Velocity's revenues in 2008, the truth is the exact opposite. Moreover,

there is no evidence that Celerity profited as a result of the alleged infringement. Celerity did not sell broadcasts for anyone but Velocity, so any profits Celerity earned were solely the result of bringing more business, and more profits, to Velocity.

Under § 35 of the Lanham Act, a plaintiff may recover from an infringer its profits and any damages sustained by the plaintiff. 15 U.S.C. § 1117(a). However, the plaintiff bears the burden of proving the defendant's sales or other damages. *Caesars World, Inc. v. Venus Lounge, Inc.*, 520 F.2d 269, 273 (1975). Velocity's inability to offer any evidence of damages precludes any recovery for its trademark infringement claim. *Caesars World, Inc.*, 520 F.2d at 273 ("Plaintiff having waived any attempt to show actual damages in dollars and cents, it is not entitled to compensation under the Lanham Act for what the court thinks its damages might have been.").[14]

## C. THE RECORD DOES NOT SUPPORT VELOCITY'S CLAIM THAT CELERITY OTHERWISE BREACHED THE RESELLER AGREEMENT

In addition to the claims already discussed, Velocity also attempts to state a claim for breach of contract for Celerity's alleged breach of a non-solicitation provision. (Complaint, No. 09-151, Count IV). This claim is unsupported by any evidence whatsoever, and Velocity bears the burden of proving any such alleged breach. *See Chainey v. Street*, 523 F.3d 211, 211 (3d Cir. 2008). Consequently, Celerity is entitled to summary judgment.

---

[14] Count III of Velocity's second complaint alleges that Celerity's failure to abide by Velocity's brand guidelines is a breach of the Reseller Agreement. For the same reasons that Velocity cannot establish a claim under the Lanham Act, Celerity is entitled to summary judgment on this breach of contract claim as well.

**D. CELERITY IS ENTITLED TO A DECLARATORY JUDGMENT THAT VELOCITY'S EARLY TERMINATION WAS A MATERIAL BREACH OF THE RESELLER AGREEMENT**

Because Elias chose to terminate the Reseller Agreement while this action was pending, he materially changed the nature of the declaratory relief requested by each of the parties. Thus, Celerity now seeks summary judgment finding that Velocity was not entitled to terminate the Reseller Agreement and that doing so constituted a material breach.

The Reseller Agreement could be terminated before the expiration of its three-year term **only** "if the other party commits a material breach of this Agreement and fails to cure such material breach within thirty (30) days of receipt of notice from the non-breaching party specifying the nature of the breach." (App. Ex. 1, Reseller Agreement, Sec. VIII.) Velocity based its early termination solely on two alleged breaches: the refusal to pay cancellation fees and the alleged trademark infringement. (*See* App. Ex. 12.B, September 2, 2009 Letter.) As Celerity has demonstrated, both of those claims lack merit. Consequently, Velocity had no justification for terminating the Reseller Agreement and Celerity is entitled to a declaration that Velocity's early termination constitutes a material breach of the Reseller Agreement.

Even if Velocity were able to establish that Celerity's refusal to pay cancellation fees, or its use of the phrase "Celerity-Velocity," were breaches of the Reseller Agreement, it could never establish that those acts were material breaches. If a breach is merely an immaterial failure to abide by contractual obligations, the contract remains effective. *Widmer v. Eng'r., Inc. v. Dufalla*, 2003 Pa. Super. 391, ¶23, 837 A.2d 459, 468 (2003).

"Whether a breach is so substantial as to justify an injured party's regarding the whole transaction as at an end 'is a question of degree; and it must be answered by weighing the

consequences in the actual custom of men in the performance of contracts similar to the one that is involved in the specific case.'" *Gray v. Gray*, 448 Pa. Super. 456, 468, 671 A.2d 1166, 1172 (1996) *(citing 2401 Pennsylvania Ave Corp. v. Federation of Jewish Agencies of Greater Phila.*, 319 Pa. Super. 228, 242-43, 466 A.2d 132, 139 (1983) (quotations in original)). In determining materiality, Pennsylvania courts consider the following factors:

a. the extent to which the injured party will be deprived of the benefit which it reasonably expected;

b. the extent to which the injured party can be adequately compensated for that part of the benefit of which he will be deprived;

c. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

d. the likelihood that the party failing to perform or offer to perform will cure its failure, taking into account all the circumstances including any reasonable assurances; and

e. the extent to which the behavior of the party failing to perform or offer to perform comports with standards of good faith and fair dealing.

*Widmer*, 2003 Pa. Super. 391, ¶23, 837 A.2d at 468 (*citing* Restatement (Second) of Contracts § 241 (1981)).

Generally a "material breach" of a contract is "a failure to do something so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." 23 WILLISTON ON CONTRACTS § 63:3 (4th ed. 2005). Celerity's failure to pay a cancellation fee cannot constitute a material breach because Velocity has not been deprived of the benefit of Celerity's performance. Celerity delivered millions of dollars in sales to Velocity, fulfilling the essential

purpose of the agreement. Further, the cancellation fees do not reflect losses for which Velocity should be reimbursed – they are simply an unconscionable penalty. Velocity's willingness to waive such fees for every other customer demonstrates that these fees were not an essential component of the parties' bargained-for performance, and Celerity's refusal to pay cannot constitute a material breach.

And even less need be said about the purported trademark infringement. Velocity's complaint is trivial at best, and the "infringing" use only served to bring Velocity millions of dollars of revenues it would never have earned without Celerity's efforts. There is no logical explanation for how the juxtaposition of the words "Celerity" and "Velocity" could justify early termination of the agreement. This can hardly be considered "a failure to do something so fundamental to a contract that the failure to perform that obligation defeats the essential purpose of the contract or makes it impossible for the other party to perform under the contract." 23 WILLISTON ON CONTRACTS § 63:3 (4th ed. 2005).

Having established that Velocity's basis for early termination is illusory, there remains no genuine issue of material fact that would preclude this Court from issuing a declaration that said termination was wrongful. And unlike Velocity's trivial claims, the termination of the exclusive rights that Celerity had earned certainly defeats the essential purpose of the contract and makes it impossible for Celerity to receive the benefit of its bargain.

## IV. CONCLUSION

For all the foregoing reasons, Celerity respectfully requests that this Court grant the relief requested in Celerity's Motion for Summary Judgment and dismiss Velocity's two (2) complaints with prejudice. Celerity further asks that the Court find that Velocity materially breached the Reseller Agreement with Celerity by terminating that agreement prior to the end of its stated term.

Dated: February 25, 2011

Respectfully Submitted,

MEYER, UNKOVIC & SCOTT LLP

By: */s/ Chad I. Michaelson*
Thomas A. Berret (PA 26329)
Chad I. Michaelson (PA 88725)

535 Smithfield Street
Suite 1300
Pittsburgh, PA 15222-2315
(412) 456-2800

MARTIN, FOLINO, HARMON & STACHLER

By: */s/ John H. Stachler*
John H. Stachler
*Admitted pro hac vice*

P.O. Box 10068
214 West Monument Avenue
Dayton, OH 45402-7068
(937) 461-5980

COUNSEL FOR DEFENDANT

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the within Memorandum in Support of Motion for Preliminary Injunction was served this 25th day of February 2011, via the Court's electronic transmission facilities pursuant to Fed. R. Civ. P. 5(b)(3) and Local Rule 5.5:

Barbara A. Scheib
Cohen & Grigsby, P.C.
625 Liberty Avenue
Pittsburgh, PA 15222-3152

*/s/ Chad I. Michaelson*

COUNSEL FOR DEFENDANT