IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

VELOCITY INTERNATIONAL, INC.  )
d/b/a VELOCITY BROADCASTING,  )
                         )
      Plaintiff,      )
                         )
  v.                  )    Civil Action No. 09-102
                         )    (consolidated with Civil
CELERITY HEALTHCARE        )     Action No. 09-151)
SOLUTIONS, INC. f/k/a      )
CELERITY HEALTHCARE        )
SOLUTIONS, LLC,          )
                         )
      Defendant and    )
      Third-Party      )
      Plaintiff,      )
                         )
  v.                  )
                         )
PHILIP ELIAS,          )
                         )
      Third-Party      )
      Defendant.      )

**MEMORANDUM**

I

Before the Court are cross-motions for summary judgment under Fed.R.Civ.P. 56 filed by Plaintiff, Velocity International, Inc. ("Velocity"), and Defendant, Celerity Healthcare Solutions, Inc. ("Celerity"), in connection with claims asserted by Velocity in Civil Action Nos. 09-102 and 09-151. (Docket No. 73, No. 86). In addition, Velocity and Third-Party Defendant, Philip Elias ("Elias"), move for summary judgment with respect to the counterclaims and third-party claim asserted by Celerity in this litigation. For the reasons set

1

forth below, (1) Celerity's motion for summary judgment on Velocity's breach of contract claim (in Civil Action No. 09-102) relating to Celerity's alleged liability for cancellation fees will be **granted** and Velocity's cross-motion for summary judgment on this claim will be **denied**; (2) Celerity's motion for summary judgment on Velocity's Lanham Act claims (in Civil Action No. 09-151) will be **granted**; (3) Celerity's motion for summary judgment on Velocity's breach of contract claim (in Civil Action No. 09-151) relating to the limited license granted to Celerity to use Velocity's trademarks and service marks will be **granted** and Velocity's cross-motion for summary judgment on this claim will be **denied**; (4) Celerity's motion for summary judgment on Velocity's breach of contract claim (in Civil Action No. 09-151) relating to Celerity's alleged solicitation of one of Velocity's business partners will be **granted**; (5) Velocity's request for a declaratory judgment (in Civil Action Nos. 09-102 and 09-151) will be **dismissed as moot**; (6) Velocity's motion for summary judgment on Celerity's first, second, third, fourth and sixth counterclaims will be **denied**; (7) Elias's motion for summary judgment on Celerity's fourth counterclaim will be **denied**; and (8) Celerity's request for a declaratory judgment in its fifth counterclaim will be **dismissed as moot**.

II

The following facts are undisputed:

**History and Nature of Velocity/Celerity Relationship**

Velocity provides program development, production and other services for direct broadcast marketing and informational programs in various industries, including the pharmaceutical industry.  (Docket No. 97, ¶ 1).  The principals of Velocity are Elias, President and Chief Executive Officer ("CEO") (Docket No. 74-2, p. 7 (Depo. p. 23)),[1] Jeffrey Esswein ("Esswein"), Chief Operating Officer ("COO") (Docket No. 77-6, p. 4 (Depo. p. 9)), and Susan Franklin ("Franklin"), Senior Vice President, Strategic Business Development ("Sr. VP") (Docket No. 76-5, p. 4 (Depo. p. 11)).

Typically, Velocity's programs are produced at a studio in Pittsburgh and simultaneously broadcast in high definition ("HD") to multiple locations.  Velocity maintains contractual relationships with Morton's The Steak House ("Morton's") and Maggiano's Little Italy ("Maggiano's") restaurants for the provision of private dining rooms at locations throughout the country in which guests can view Velocity's invitation-only broadcasts in proprietary Velocity HD suites.  (Docket No. 97, ¶¶ 2, 10).

---

[1] Russell Rice was the President of Velocity for a portion of the time period that is relevant in this case.  He left Velocity in 2008.  (Docket No. 76-5, p. 4 (Depo. p. 12), No. 79-8, p. 6 (Depo. p. 15)).

Velocity markets its broadcast services through two separate sales channels: direct sales and reseller sales. With regard to direct sales, companies wishing to purchase Velocity's broadcast services deal with and enter into contracts with Velocity, and payment is made to Velocity by the end-user customer that is sponsoring the broadcast. As to reseller sales, authorized Velocity resellers purchase Velocity's broadcast services from Velocity for resale to end-user customers, and Velocity is paid by the resellers. Resellers may sell additional complementary value-added services and may mark up the prices for Velocity's broadcast services. Resellers also earn commissions on their sales of Velocity broadcasts. Velocity uses a uniform Rate Card for direct sales and reseller sales. (Docket No. 97, ¶¶ 3-7, 161).

Velocity's resellers enter into master agreements with Velocity that govern the relationship and establish payment terms for the private broadcasts purchased by the resellers for their customers. Velocity's reseller agreements contain provisions relating to reserving and paying for the private dining rooms in the restaurants used for broadcasts. (Docket No. 97, ¶¶ 8-9).

Kurt Janson ("Janson") and Timothy Gatzulis ("Gatzulis") were the principals of Celerity.[2]  Ann O'Toole ("O'Toole") was Celerity's Director of Client Services.  (Docket No. 81-1, pp. 6-7 (Depo. pp. 20-22)).  From approximately July 2006 until September 2, 2009, Celerity was a reseller of Velocity broadcasts.  During this period of time, Velocity and Celerity signed two successive master agreements that governed the terms of their relationship.  The initial reseller agreement, which became effective on August 1, 2006, was signed on Velocity's behalf by Elias and on Celerity's behalf by Janson.  (Docket No. 90-2, No. 97, ¶¶ 11-14).

Among the services to be provided by Velocity under the initial reseller agreement with Celerity were network access, event management and broadcast production (which included a set, cameras with teleprompters, a director, producer, crew and show host and make-up and wardrobe assistance).  The terms of the initial reseller agreement authorized Celerity to resell Velocity's services to Celerity's customers in the pharmaceutical, medical and healthcare-related industries.  In addition, the initial reseller agreement granted Celerity "Limited Exclusivity in the field of oncological pharmaceuticals including the field of hematology," which meant "that Velocity

---

[2] Celerity ceased business operations in early October 2009.  (Docket No. 81-1, p. 6 (Depo. p. 19)).

will not sell directly or authorize any third party to resell Velocity Services to any clients or for any Broadcast content in or directly related to the field of oncological or hematological pharmaceuticals" during the term the agreement.  (Docket No. 90-2, pp. 1-3, No. 97, ¶¶ 16-19).

The provision in the initial reseller agreement relating to intellectual property ("IP") rights stated:

*    *    *

6. **General Terms and Conditions**

*    *    *

d.  All rights, title and interest not otherwise reserved by Velocity with your prior written consent with respect to advertisements, copy, layouts, scripts, commercials, art work, designs, and other materials or documents prepared, purchased or furnished by Velocity on your behalf ("Work Product") shall be your property (or the property of Celerity Clients per separate agreement between you and the applicable Celerity Client) and shall be "works for hire" owned by you with right of copyright and, if in Velocity's possession, will be delivered to you upon request.[3]  You hereby grant to Velocity a perpetual, irrevocable, royalty-free, right and license to use, copy, distribute or transfer ("Use") the Work Product, provided such Use is not in competition with, or materially adverse to your interests or the interests of Celerity Clients.  You will obtain all necessary rights from Celerity Clients to give full force and effect to the foregoing provision, and shall indemnify Velocity to the extent set forth in section 6.e. below for any breach of this provision.

---

[3] In the case of a "work made for hire," the employer or other person for whom the work is prepared is considered the author under federal copyright law. Unless the parties have expressly agreed otherwise in a written instrument signed by them, the employer or other person for whom the work is prepared owns the copyright in the work.  18 C.J.S. § 23 (2011), citing 17 U.S.C.A. § 201(b).

\*   \*   \*

(Docket No. 80-1, p. 6).

In March 2008, Velocity and Celerity executed a new master agreement with an effective date of October 1, 2007 ("the second reseller agreement").[4]   (Docket No. 90-3, No. 97, ¶ 21).   With respect to sales and marketing, the second reseller agreement provided:

\*   \*   \*

II. **Sales**

A.   <u>Reseller Authorization</u>: Velocity hereby authorizes Reseller to market, promote and sell Velocity Services to Prospective Customers, ..., during the Term subject to the terms and conditions of this Agreement. Reseller will use its best efforts to identify Prospective Customers, and to promote and sell Velocity Services during the Term to Prospective Customers.  The foregoing authorization may be limited to a particular industry or market segment and/or be subject to limited exclusivity if so specified in Exhibit A under "Market Scope".

B.   <u>Customer Agreements</u>: Reseller will enter into a written agreement with each Customer ("Customer Agreement").  Velocity shall not be a party to any Customer Agreement, but shall be deemed a third party beneficiary pursuant to Customer Agreements.  Velocity understands and acknowledges that there will be circumstances under which the agreements between Reseller and Customer will not mirror Exhibit B, but such fact shall not relieve Reseller of its obligations to Velocity hereunder except with Velocity's prior written approval in each instance. Nevertheless, Reseller agrees to use best efforts to secure an agreement with Customer that that (sic) is

---

[4] The second reseller agreement between Velocity and Celerity was signed on the companies' behalf by Elias and Gatzulis, respectively.  (Docket No. 90-3, No. 97, ¶ 24).

consistent with the terms set forth in Velocity's
standard customer agreement (titled "Velocity
Broadcast (sic) Agreement", a sample of which is
attached as Exhibit B)....

\*   \*   \*

F.   **Trademarks**: Solely for purpose of the marketing
activities described in section II.C above, Velocity
hereby grants to Reseller the limited, non-exclusive
right and license to use Velocity's trademarks and
services (sic) marks strictly in accordance with the
guidelines for such usage provided by Velocity to
Reseller from time to time.  Velocity reserves the
right to revoke the foregoing right and license to
protect and preserve Velocity's rights in its
trademarks and service marks and the goodwill
associated therewith.  Except for the limited rights
granted in the foregoing, Reseller obtains no other
rights in Velocity Trademarks and all rights are
hereby reserved by Velocity.[5]

\*   \*   \*

(Docket No. 90-3, p. 2).

As to fees, reporting anticipated sales, leads and non-

solicitation, the second reseller agreement stated:

\*   \*   \*

III. Fees for Velocity Services; Sponsorship Commissions

A.   **Fees and Payment**: Reseller will pay Velocity the fees
set forth in Velocity's then-current Rate Cards for
Velocity Services ("Fees") and will use best efforts
to do so in accordance with Velocity's standard
payment terms as set forth therein for each Broadcast
that Reseller sells to a Customer.  Reseller
acknowledges that it shall, under any such
circumstances, secure payment in full to Velocity on

---

[5] With respect to Velocity's usage guidelines for its trademarks and service
marks, Gatzulis testified during his deposition that he did not recall seeing
any usage guidelines prior to July 9, 2009, when he received an email from
Velocity to which the usage guidelines were attached.  (Docket No. 81-2, p. 6
(Depo. pp. 117-20)).

or before the date of such Broadcast, unless Velocity agrees to alternate payment provisions prior to the Broadcast.  Reseller may mark-up such Fees as charged to its Customers and retain any such mark-up amounts....

\*   \*   \*

IV. Sales Registration Process and Reporting

\*   \*   \*

B.   **Reporting**: Reseller shall provide to Velocity a monthly forecast of anticipated sales of Velocity Services which includes the following information: (1) name of Prospective Customer; (2) targeted date(s) for the Broadcast(s); (2) (sic) month the sale is projected to close; (3) (sic) probability of closing the sale; (4) (sic) number of Broadcast ground host partner locations; and (5) (sic) other information as reasonably requested by Velocity from time to time.

C.   **Velocity Leads**: If Velocity becomes aware of a Prospective Customer that is within the Market Scope set forth in Exhibit A, section IV while Limited Exclusivity is in force (pursuant to the terms of Exhibit A, section IV), Velocity will promptly notify Reseller and provide Reseller with contact information for such Prospective Customer to facilitate Reseller's marketing efforts with such Prospective Customer.

\*   \*   \*

VII. No Solicitation

... [E]ach party agrees that during the Term of this Agreement and for a period of twelve (12) months thereafter, such party shall not, directly or indirectly: ... (2) solicit for business any Velocity Client, Velocity Business Partner, or client of a Velocity affiliate, as applies to the restriction on Reseller, or any Customer, as applies to the restriction on Velocity, in any way that would be detrimental to the other party or its affiliate; or (3) interfere with any contractual or business relationship (i) as applies to the restriction on Reseller, between Velocity and a Velocity Client or

> Velocity Business Partner, or between any Velocity
> affiliate and such affiliate's client or Business
> Partner; or, (ii) as applies to the restriction on
> Velocity, between Reseller and a Reseller Customer.[6]
>
>        *   *   *

(Docket No. 90-3, pp. 2-5).

The language in the provision of the second reseller agreement granting limited exclusivity to Celerity, which was set forth under "Market Scope" in Exhibit A to the agreement, differed from the language of the limited exclusivity provision in the parties' initial reseller agreement.  Specifically, in the second reseller agreement Velocity agreed "to refrain from entering into any other reseller agreement with any entity for resale of Velocity Services" in the "Pharma Segment," which was defined as "any manufacturers of drugs, medicines or other non-organic but biologically interactive treatments for humans (e.g., excluding medical devices and biotech/organic treatments)" and "any promotional or educational (IME) programming targeted at physicians, registered nurses or other allied health professionals, clinical investigator or other similar programs and any programs directed toward pharmaceutical

---

[6] The second reseller agreement defines a Velocity "Business Partner" as "any entity that has an existing contractual relationship, or is in active negotiations, with Velocity, for any purpose other than the purchase of Velocity Services," and a Celerity "Customer" as "an end customer who has purchased and is under contract for Velocity Services from Reseller or any other entity, such as a Medical Communications Company 'MedCom' that has either contracted or subcontracted with Celerity for services that include Velocity Services."  (Docket No. 90-3, p. 1).

or biotechnology company representatives."  In the event
Celerity met the revenue targets set forth in Exhibit A to the
second reseller agreement, Celerity would remain Velocity's
exclusive reseller in the "Pharma Segment" through September 30,
2010.[7]  (Docket No. 90-3, p. 8, No. 97, ¶¶ 22, 35).

The sample "Velocity Broadcasting Agreement" attached to
the second reseller agreement as Exhibit B contained the
following provisions regarding payment terms, broadcast
cancellation fees and IP rights:[8]

\*    \*    \*

3. **Payment Terms**

You agree to pay the Network Access and Event
Management Fee, the Program Production Services Fee,
any applicable Optional Services Fees detailed in
Exhibit A, and the Hospitality charges (collectively
in this section referred to as "Fees") in accordance
with the payment schedule below:

a.    Payment Schedule: 35% due upon signature of this
Agreement; 35% due thirty (30) days in advance of
the Broadcast date; and final 30% due seven (7)
days in advance of the Broadcast date.

\*    \*    \*

---

[7] Regarding Celerity's revenue targets, during his deposition, Elias was asked
whether he was "satisfied with the amount of money that Velocity made as a
result of the [parties'] relationship."  In response, he testified: "You
know, as far as satisfied, they did not meet their goals in the first
Reseller Agreement; they did in their second.  So there were parameters built
into the contract; they met them.  I was satisfied."  (Docket No. 74-2, p. 24
(Depo. pp. 89-90)).

[8] Celerity did not submit copies of the broadcast agreements signed by its
customers to Velocity.  (Docket No. 97, ¶ 73).  However, pursuant to Section
IV.B. of the second reseller agreement, Celerity did provide Velocity with
monthly Reseller Forecasts to report which broadcasts were under contract and
which were not.  (Docket No. 76-1, pp. 2-4, No. 77-1, pp. 2-4, No. 77-2, pp.
2-5, No. 77-3, pp. 2-5, No. 77-4, pp. 2-4).

## 4. Cancellation Provisions

You may cancel a Broadcast at any time, but certain Fees will be due and non-refundable depending upon when you notify Velocity Broadcasting of cancellation. Cancellation Fees are outlined below:[9]

a.   For cancellation less than sixty (60) but at least thirty (30) days in advance of the Broadcast date: 35% of the Network Access and Event Management Fee and the Program Production Services Fee shall be due and non-refundable upon cancellation.

b.   For cancellation less than thirty (30) but at least twenty (20) days in advance of the Broadcast date: 60% of the Network Access and Event Management Fee and the Program Production Services Fee shall be due and non-refundable upon cancellation.

c.   For cancellation less than twenty (20) days in advance of the Broadcast date: 100% of the Network Access and Event Management Fee and the Program Production Services Fee shall be due and non-refundable upon cancellation.

d.   In addition to the above cancellation fees, you acknowledge and agree to pay the applicable cancellation fees set forth in the [Reservation] Confirmation Letter.

\*     \*     \*

## 5. General Terms and Conditions

---

[9] Cancellation fees are a common business practice in the hospitality, convention and media industries. During the period that Celerity acted as a reseller of Velocity's broadcast services, Celerity routinely included Velocity's cancellation fees in its contract proposals to, and written broadcast agreements with, customers. There was no provision in the second reseller agreement requiring Velocity to waive the cancellation fees outlined in the Velocity Broadcasting Agreement for a broadcast that was canceled due to the failure of a pharmaceutical company's product to win approval by the United States Food and Drug Administration ("FDA"). In fact, there was no provision in the second reseller agreement addressing the issue of fees in the event a broadcast was canceled. (Docket No. 97, ¶¶ 67-68, 76).

a.   Intellectual Property: The Velocity Program that will be produced by Velocity as described in this Agreement will feature your product and/or services information, advertising, promotional content, commercial data, educational materials, research information and/or any other information that you provide to Velocity for use in or with the Velocity Program (collectively "Content"). Velocity recognizes that you have invested considerable resources in your Content – that your Content belongs to you and that you will continue to own all rights, title and interest in and to your Content.

Similarly, Velocity will be investing considerable resources and creativity to produce the Velocity Program that will feature your Content, so Velocity will own all rights, title and interest in and to the Velocity Program, subject to your continuing ownership rights in your Content and the confidentiality provisions of this Agreement.

To facilitate the production of the Velocity Program, you hereby grant Velocity a non-exclusive, non-transferable license to use your Content to produce and broadcast the Velocity Program featuring your Content, perform all of the other Velocity services described in this Agreement, and to copy, edit, reformat, distribute, broadcast and rebroadcast your Content as part of the Velocity Program in whole or in part, and strictly subject to the confidentiality provisions of this Agreement related to your Content.

Velocity may provide to you copies of the Velocity Program featuring your Content on DVD or other media ("Media Copies"). Velocity hereby grants to you a perpetual, royalty-free, non-exclusive, irrevocable right and license to view and display the Media Copies solely within your business organization by employees or contractors of your organization. You may not copy, edit, reformat, distribute, broadcast or rebroadcast any Velocity Program without Velocity's prior written permission in each instance.

> All rights not expressly granted in this
> Agreement are retained by their respective owner.

                    *    *    *

(Docket No. 90-3, pp. 10-11, No. 97, ¶ 168).[10]

A sample of the "Reservation Confirmation Letter" referred to in Section 4.d. of the Velocity Broadcasting Agreement was attached to the second reseller agreement as Exhibit C and provided in part:

                    *    *    *

> Dear [insert client name],
>
> We are pleased to confirm Velocity Broadcasting's reservation of the Private Boardrooms* listed in the attached Private Boardroom List for your upcoming Broadcast event.

                    *    *    *

> Your reservation will be held for a period of seven (7) calendar days.  To firm book this reservation, please remit a $250 non-refundable deposit per Private Boardroom ("Deposit") to Velocity Broadcasting within seven (7) calendar days of the date of this letter.  Your remittance of the Deposit will firm book the Private Boardrooms on the Private Boardroom List for your Broadcast event and will indicate your agreement to the terms stated in this letter.
>
> All Deposits are non-cancelable and non-refundable....

                    *    *    *

---

[10] This IP provision is intended to prevent rebroadcast of programs developed and produced by Velocity without its permission or compensation.  (Docket No. 97, ¶ 169).  In other words, after the Velocity Broadcasting Agreement attached to the second reseller agreement as Exhibit B became effective, the programs that Velocity produced for private broadcast were no longer "works made for hire."  Rather, Velocity retained ownership of the programs and charged end customers a fee to rebroadcast or "repurpose" the programs. (Civil Action No. 09-151, Docket No. 1, ¶¶ 50-52).

Next Steps

Velocity Broadcasting is pleased to offer our private broadcast services to you, and eager to begin planning and producing your Broadcast.

To get us started, we have outlined Next Steps below:

- Remit your Deposit and a signed copy of this letter for our records within seven (7) calendar days of the date of this letter to firm book your Broadcast reservation.
- Review and sign the enclosed Velocity Broadcasting Agreement to allow us to begin work for you.
- Velocity Broadcasting will begin planning your Broadcast event upon receipt of a signed copy of the enclosed Velocity Broadcasting Agreement.[11]

\*   \*   \*

(Docket No. 90-3, pp. 16-17).

Clients of Velocity and its resellers who wish to purchase a private broadcast program commence the process by requesting information regarding studio and restaurant location availability for one or more dates. Velocity's production schedule generally requires 90 days' lead time from the date that tentative search selections are received to the broadcast date. Velocity is limited to conducting one broadcast on any given date due to high production demands. Also, broadcasts of Velocity's programs are rarely scheduled on Mondays and Fridays which narrows the number of available dates. (Docket No. 97, ¶ 62).

---

[11] As noted previously, 35% of Velocity's fees for a broadcast were due upon the customer's execution of a Velocity Broadcasting Agreement.

**Broadcasts for AstraZeneca in 2008**

One of Celerity's customers for Velocity's private broadcast services was AstraZeneca ("AZ"), a pharmaceutical company. On February 4, 2008, Cathy Senko ("Senko"), Velocity's accountant, sent an email to Gatzulis to which she attached an invoice for a Velocity broadcast for AZ that was scheduled for April 23, 2008.[12] In his responsive email, Gatzulis stated, among other things: "Also AZ was quoted a Network Access volume discount of 10% (approved by Philip).[13] The HD rate of $2850 was reduced to $2565. Our invoice from Velocity should total approximately $2180 ($2565 less 15%)[14] per site." (Docket No. 78-5, pp. 3-4).

On February 11, 2008, Katherine Rhea ("Rhea"), Velocity's Earth and Sky Coordinator,[15] sent the following email to Senko regarding her inquiry into Gatzulis's claim of an approved 10% volume discount on network access fees for AZ: "Cathy, Russell

---

[12] Senko is responsible for billing Velocity's clients and resellers for its broadcast services. (Docket No. 78-3, p. 4 (Depo. pp. 8-9)).

[13] There is no dispute that the "Philip" to whom Gatzulis refers in this email is Elias.

[14] Under the terms of the second reseller agreement, Celerity received a 15% discount on Velocity's network access fees.

[15] As Earth and Sky Coordinator, Rhea is responsible for site availability searches and studio and restaurant reservations for Velocity broadcasts. (Docket No. 97, ¶¶ 83-84). Rhea also is responsible for submitting the information necessary for Senko to prepare invoices for Velocity's broadcasts. (Docket No. 78-3, p. 5 (Depo. pp. 10-11)). Rhea's maiden name, "Milliron," appears on some of the documents submitted in support of the parties' respective summary judgment motions. To avoid confusion, the Court will use Rhea's married name throughout this Memorandum Opinion.

has confirmed that this Network Access price change is correct.[16]
I have attached the updated billing summary.  Please re-invoice
them with this corrected amount."  The next day, Senko sent an
email to Janson and Gatzulis to which she attached a revised
invoice for the AZ broadcast scheduled for April 23, 2008,
reflecting the 10% discount.[17]   (Docket No. 78-5, pp. 2-3).

Eight months later, on October 6, 2008, Janson sent an
email to Elias regarding Velocity's invoices for three
additional broadcasts that had been conducted for AZ since the
April 23, 2008 broadcast, stating:

> Philip:
>
> Below is the email exchange with Velocity regarding this
> years (sic) initial AZ Broadcast (April 23).  I have also
> attached the original and revised invoices from Velocity
> for your review.  This 10% discount was to be applied to
> all of their 2008 broadcasts per our discussion.
>
> In going through subsequent broadcast invoices it appears
> that we did not catch the 10% discount oversight and thus
> were charged incorrectly.  Only broadcast 1 was revised.
> Please refer to the attached spreadsheet for the updated
> correct totals.  Let me know how you want to handle the
> over charge on broadcasts 2 thru 4? (sic)  I don't believe
> we have been invoiced for broadcasts 5 and 6 as of yet.  I
> will be traveling in the morning but available on my mobile
> from about 12 NOON CT thru the balance of the afternoon.
>
> Regards,

---

[16] The "Russell" to whom Rhea refers in this email is Russell Rice, who, as
noted in footnote 1, was Velocity's President for a period of time in 2008.
(Docket No. 74-2, p. 7 (Depo. p. 24)).
[17] With respect to the relationship between Velocity and Celerity at this point
in time, on February 15, 2008, Elias sent an email to Gatzulis stating: "We
have a great partnership that will go way beyond Pharma.  We are the paradigm
shift in communications.  Thanks for all (sic) hard work...."  (Docket No.
92-3, p. 15).

Kurt

(Docket No. 92-4, p. 44, No. 97, ¶ 197).

Elias responded the next day as follows:

Thanks Kurt,

You really need to help me out here.  Please send me the e-mail that outlines the specifics of the deal and my confirmation.  I have looked and cannot find anything.  I have a call into Celia to have her search for any documentation.[18]  At this point, we do not have any documentation or action from our part or your part that would trigger a volume discount.  I don't even know what the "volume" represents, any milestones that would have to be met or pro rating parameters that we (sic) would have been unequivocally required.  Also all the billing (except for one) over that last 9 months has been at the normal rate.  We have had no other conversations or correspondence on this topic for AZ or any other one of your clients and none of AZ's broadcasts were booked from a volume perspective.

I think you know my style by now, that these sort of requests go into a business model process, are documented, put through legal (if required) and sent back to you.  And you know how painfully long that takes at times.  This would have certainly fallen into this category.  You guys throw a lot of requests into the game that do not always fit into the rule book.  I am very careful to process them diligently and we stand by our decisions.  Kurt, I will continue to look for anything that would have detailed the

---

[18] The "Celia" to whom Elias refers in this email is Celia Bauer, Esquire, Velocity's counsel.  (Docket No. 76-6, p. 13 (Depo., p. 151)).

specifics.  Until we can validate it; (sic) please consider all billing as stands.

Best Regards,
Philip L. Elias

(Docket No. 92-4, pp. 43-44).

Janson's prompt response stated:

Philip,

This is all I could find.  Our April 23 broadcast (AZ 1) imvoice (sic) was revised and I am quite sure Cathy didn't do it on her own since I referenced your name.  AZ is our only client that a discussion of this nature, between us, took place.  I believe you know my "style" as well and I would never offer anything up w/out discussing and attaining (sic) your approval.  Speak with who (sic) you must on your side but a quick response on what, if anything, you plan to do would be appreciated.  This will allow me to plan accordingly.

Kurt

(Docket No. 92-4, p. 43).[19]

## The Daiichi Sankyo/Effient Broadcasts

One of the medical communications companies to which Celerity sold Velocity's private broadcast services was MediMedia Education Group ("MMEG").  Celerity entered into multiple contracts with MMEG, including a master services agreement and individual agreements relating to specific broadcasts for pharmaceutical companies that MMEG represented.

---

[19] Janson asserts that during a private 10-15 minute discussion with Elias in a conference room in Velocity's offices in early 2008, Elias orally agreed to a 10% volume discount on network access fees for any broadcasts conducted for AZ in 2008.  Elias denies this assertion.  (Docket No. 97, ¶¶ 197-99, 203).  Elias does admit, however, that the 10% volume discount for AZ's network access fees in 2008 was approved by Russell Rice, Velocity's President at the time.  (Docket No. 74-4, p. 5 (Depo. pp. 218-19)).

The broadcasting agreements executed by MMEG for Velocity's programs contained the provision pertaining to Velocity's cancellation fees.  (Docket No. 97, ¶¶ 77-78, 80).

In May 2008, MMEG advised Celerity that it had entered into a contract with a pharmaceutical company called Daiichi Sankyo, and that Daiichi Sankyo wanted to conduct a broadcast in August 2008 as part of its launch of a new product called Effient.[20] (Docket No. 97, ¶¶ 81-82).  On May 5, 2008, an email exchange took place between O'Toole (Celerity's Director of Client Services) and Rhea (Velocity's Earth and Sky Coordinator) in which Rhea was asked to check studio and restaurant availability in August 2008 for the Effient broadcast.[21]  Upon receipt, O'Toole forwarded the requested information to MMEG.  (Docket No. 97, ¶¶ 87-88).

On June 6, 2008, a non-refundable deposit of $15,250 was paid by MMEG to reserve 61 private dining rooms at various Morton's restaurants on August 19, 2008 for the Effient broadcast.  Celerity's contract proposal for the Effient broadcast, which was sent to MMEG on June 18, 2008, contained the provision setting forth Velocity's broadcast cancellation fees.  (Docket No. 82-3, p. 4, No. 97, ¶¶ 89-91, 95-96).

---

[20] The initial name assigned to Effient was Pasrugel.  (Docket No. 97, ¶ 82).
[21] O'Toole was involved in managing broadcast logistics for Celerity and frequently interfaced with Rhea.  (Docket No. 97, ¶¶ 83-84).

After receiving Celerity's contract proposal for the August 19th Effient broadcast, MMEG indicated that it could not sign the broadcast agreement because the IP provision conflicted with the IP provision in MMEG's contract with Daiichi Sankyo.[22]  As a result, Celerity requested a modification of the IP provision in Velocity's standard broadcasting agreement to allow Daiichi Sankyo to "repurpose" the content in the Effient broadcast.[23]  In response, Velocity agreed to develop pricing for content "repurposing," as well as a rights assignment model.[24]  (Docket No. 97, ¶¶ 171, 174-76).

On June 26, 2008, MMEG notified Celerity that FDA approval for Effient had been delayed and, therefore, the Effient broadcast scheduled for August 19, 2008 would have to be postponed.  In turn, Celerity notified Velocity of the FDA approval delay and need to reschedule the broadcast.  The

---

[22] See footnote 10.

[23] In its brief in opposition to the motion of Velocity and Elias for summary judgment on its counterclaims and third-party claim, Celerity explained the importance of the right to "repurpose" a broadcast as follows: "Because the customers create the content for these broadcasts, (footnote omitted) and because of the significant time and resources customers spend developing each broadcast, they expect to have some rights to re-use the broadcasts in order to earn a return on their investments.  Velocity's [IP] terms, however, effectively prohibited the customer from showing the broadcast to the audience for which it was intended after the live broadcast was over." (Docket No. 93, p. 10).

[24] According to Celerity, MMEG had purchased Velocity broadcasts when the parties were operating under the initial reseller agreement which did not include the objectionable IP provision.  When MMEG realized that Velocity was attempting to limit the customer's repurposing rights, it immediately raised an objection with Celerity.  (Docket No. 93, p. 10, fn.2).

notification stated: "They understand that their site deposits
will be lost."[25]   (Docket No. 90-31, p. 2).

The Effient broadcast was rescheduled for October 28, 2008.
Rhea discussed the delay in FDA approval with contacts at
Morton's who agreed to transfer the deposits that had been paid
by MMEG to reserve private dining rooms for the August 19th date
to the new date.   During this time period, Celerity and MMEG
requested a second date for the Effient broadcast.   The date
selected was December 2, 2008.[26]   (Docket No. 90-32, p. 297,
¶¶ 102-03, 105, 107).

On July 21, 2008, Senko (Velocity's accountant) sent an
email to Gatzulis to which she attached an invoice for the
October 28th Effient broadcast.   Senko indicated, among other
things, that the deposit paid by MMEG to hold private dining
rooms for the August 19th date had been applied to the October
28th date.   Shortly after receiving Senko's email, Janson sent an
email to Franklin (Velocity's Sr. VP) regarding his receipt of
an invoice for the October 28th Effient broadcast before MMEG had
signed a contract for the broadcast.[27]   Franklin promptly brought

---

[25] These deposits were the private dining room deposits required by Velocity's
Reservation Confirmation Letter.

[26] A deposit of $24,500 was paid by MMEG on September 19, 2008 to reserve 98
private dining rooms for the Effient broadcast scheduled for December 2nd.
(Docket No. 82-3, p. 4).

[27] With respect to MMEG's continued failure to sign Celerity's contract
proposal for the October 28th Effient broadcast, the issue relating to the IP
provision remained unresolved.   Velocity and Celerity agree that a steady
deterioration in their relationship began at this time and continued through

"Celerity's issue" with the invoice to the attention of Senko

and Rhea.  In response, Senko sent the following email to

Franklin, Elias and Rhea:

                    *    *    *

    The invoice clearly states the first payment is not due
    until the contract is executed regardless of how early we
    send our invoice.  But if this is causing trouble to
    Celerity, then we can change this.

    Who knows when the contracts are executed?  Can we add this
    detail on the billing summary so we are all on the same
    page and send billing to the client at the appropriate
    time?

(Docket No. 78-6, pp. 3-4).

    On July 28, 2008, the following emails were exchanged

between Janson and Franklin:

    (Janson):

    Susie,

    I was wondering if any decisions have been made or an eta
    defined regarding the costs associated with post broadcast
    repurposing.

                    *    *    *

    (Franklin):

    I brought it up to Philip on Friday and again this morning.
    I'll try again this afternoon.   STUCK!

                    *    *    *

---

the termination of the second reseller agreement in September 2009.  (Docket
No. 97, ¶ 184).  As evidence of their deteriorating relationship, Velocity
submitted several internal emails between Janson and Gatzulis in which Elias,
Franklin and Senko are referred to in vulgar and derogatory terms.  (Docket
No. 90-50, p. 2, No. 90-51, p. 2, No. 90-52, p. 2).

(Janson):

I have deals that are at a stand still.  I know you know this.

* * *

(Docket No. 92-5, p. 22).[28]

On September 18, 2008, Janson corresponded with Elias regarding MMEG's continuing objection to the IP provision in Celerity's contract proposal for the October 28th Effient broadcast stating:

Philip,

Per our discussion last night I really need to know what you want to do as it pertains the (sic) MMEGs (sic) inability to sign our current contract due to the contracts they have in place with Diachi (sic) and Sanofi.[29]  They are requesting that we work off of the old contract for these events allowing them the next few months to revise their contracts carving out satellite broadcasts as "work for hire".[30]  As it stands right now these events will not happen unless a compromise is met.

---

[28] The next day, Gatzulis, who had been copied on the above-quoted emails, sent the following email to Janson: "I want to discuss how we will account for any lost business due to this vis a vis our target numbers.  We should not get punished for the inability of others to provide timely answers."  (Docket No. 92-5, p. 22).

[29] The "Sanofi" to which Janson refers in this correspondence is Sanofi Aventis, another pharmaceutical company and potential client of Celerity for a Velocity broadcast.  The IP provision in Velocity's standard broadcasting agreement also conflicted with the IP provision in MMEG's agreement with Sanofi Aventis.

[30] As noted earlier, under the IP provision in the initial reseller agreement, the broadcasts produced by Velocity were designated as "works made for hire." Thus, the broadcasts were owned by the end customers for whom they were produced, not Velocity, and the end customers could repurpose the program for another audience at a later date.  In the Velocity Broadcasting Agreement attached to the second reseller agreement as Exhibit B, the IP provision was changed to designate Velocity as the owner of the programs it produces for broadcast.  Therefore, an end customer could not repurpose a program without Velocity's consent.

Diachi (sic) has 2-75 site broadcasts on the books and an addition (sic) 75 site event planned for Q1-09.  Sanofi will be at a minimum a 50 site event.  In total you are looking at 275 sites plus over the next few months ($800,000).  Please let me know by late morning tomorrow so that I can put this behind us.

Kurt

(Docket No. 75-9, p. 5).

Elias responded the next morning as follows:

Good Morning Kurt,

We certainly need to figure something out.  However, we can not (sic) go back to our old contract.  That was set aside and updated about a year ago.  We have a new rate card in the works that is a pure media model.  We could give them early access to that program.  That would eliminate any of the work made for hire issues and at the scale of their broadcasts would save them money.  I will call you today to discuss.

Best Regards,
Philip L. Elias

(Docket No. 75-9, pp. 4-5).

After responding to Janson's email, Elias spoke with

Esswein (Velocity's COO) about the IP issue.  In turn, Esswein

sent the following email to Franklin on which he copied Elias,

Janson and Gatzulis:

Susie,

Philip would like to meet this morning ASAP on the issue of IP language and how it is currently written in our contract.

Please see e-mail below and let me know if you can meet on this first thing this morning.  Currently two dates are booked for 2008 that we may lose if contracts are not signed.

25

(Docket No. 75-9, p. 4).

Franklin responded to Esswein's email (including all of the individuals who had been copied on the email, i.e., Elias, Janson and Gatzulis) as follows: "I have a 9:00 a.m. - can meet at 9:45 a.m.  If the e-mail from Kurt means that October 28[th] is going to free up - my Dallas client wants that date."  (Docket No. 75-9, p. 4).  A few minutes later, Janson sent the following response to Franklin's email: "It aint (sic) going to free up. I want a solution."  (Docket No. 75-9, p. 4).  Franklin then sent the following email only to Elias and Esswein: "Isn't that date free - if we don't have payment?"  (Docket No. 75-9, p. 4).

On September 29, 2008, Tara Berringer ("Berringer"), MMEG's Director of Client Services, sent an email to Janson on which O'Toole was copied to inform them that Effient did not receive FDA approval the previous Friday as expected.  As a result, a postponement of the October 28, 2008 Effient broadcast to mid to late January was requested.  As to the December 2, 2008 broadcast for which a non-refundable deposit to reserve private dining rooms had been paid, Berringer indicated that the broadcast was "still on target."  (Docket No. 90-34).

In response to Berringer's email, O'Toole promptly sent an email to Rhea on which Elias was copied, stating that Celerity would like to release the October 28, 2008 date for the Effient

26

broadcast due to the continued failure of Effient to receive FDA approval; that Celerity was looking to reschedule the broadcast for mid to late January 2009; and that the broadcast scheduled for December 2nd would move forward as planned.  O'Toole also stated: "I know there are a lot of moving parts with this, including contract finalization, but at this time we would like to release October 28."  (Docket No. 78-9).

Shortly after receiving O'Toole's email on September 29th, Rhea sent an email to Esswein which stated:

*   *   *

Subject:        FW: Effient 10.28.08 – IMPORTANT

Importance:    High

With this cancellation at this point, they are within 65 (sic) days of the broadcast but at the 30 day mark, so they should owe 35% of the network access fees contractually.

Would you like me to charge them these or only charge and keep the F&B deposits. (sic)

Just an FYI, the F&B deposits alone total $23,750.

The 35% would total - $67,224.38

Let me know.[31]

(Docket No. 78-9).

---

[31] As evidenced by this email, upon notification that the October 28th Effient broadcast would have to be postponed due to a delay in FDA approval, Velocity immediately began internal discussions regarding how much to charge Celerity for the "cancellation" of the broadcast, even though Velocity knew that MMEG had not signed Celerity's proposed contract for the broadcast due to MMEG's objection to the language of Velocity's IP provision.  (Docket No. 96, ¶ 29).

O'Toole corresponded with Berringer (MMEG's Director of Client Services) regarding the continued failure of Effient to receive FDA approval late on the afternoon of September 29, 2008, stating in part:

* * *

> Thank you for the updates on the Broadcast. As we talked about, I'll wait for your direction on a new date, but know that we are looking at January 13, 20 or 27th as possible alternatives.

* * *

> I did have the chance to speak with Kurt [Janson] about the cancellations. He is currently trying to work out any other cancellation (postponement) fees that may be incurred. While no monies have been exchanged,[32] this postponement is occurring within 30 days of the broadcast date. Per the standard Celerity agreement, a cancellation within this time frame is subject to cancellation fees equaling 60% of the total cost. Kurt [Janson] is working toward getting some of the fee's (sic) alleviated or, (sic) applied to the January broadcast. He expects to be able to give you an answer on the (sic) by the close of business tomorrow.

* * *

(Docket No. 90-34).

The following day, September 30, 2008, Janson sent an email to Berringer to provide "an overview of the financial exposure" facing MMEG's client, Daiichi Sankyo, as a result of the postponement/cancellation of the October 28th Effient broadcast.

---

[32] As noted previously, 35% of Velocity's fees to produce a private broadcast are due at the time a customer executes a Velocity Broadcasting Agreement. Because MMEG had not executed the broadcast agreement proposed by Celerity, no payment had been made.

The purported exposure, which totaled $146,127.50, included (a)
$122,377.50 representing the 35% fee applicable when a
cancellation occurs within 30 to 60 days of the broadcast date,
(b) the $15,250.00 deposit that had been paid to reserve private
dining rooms at various Morton's restaurants for the broadcast,
and (c) $8,500.00 for deposits that were due and owing for
Morton's restaurants that had been added to the broadcast list
after the original deposit was paid. (Docket No. 90-34). When
Janson sent the September 30, 2008 email to Berringer,
Celerity's proposed contract for the Effient broadcast still had
not been executed by MMEG due to its continuing objection to the
IP provision.[33]

---

[33] With respect to the purpose of this email to Berringer regarding the
"financial exposure" of Daiichi Sankyo despite the absence of a signed
broadcast agreement, Janson testified during his deposition as follows:

\* \* \*

Q. So what did you mean when you said I'm sorry to hear about the
delay and hope the FDA can expedite their review and subsequent
approval. Below I have provided an overview of the financial exposure
for your client as it relates to our services and cancellation of this
10-28-08 broadcast?

\* \* \*

A. Well, in the process of selling anything, and especially given the
time that we worked on this in trying to get through the IP issues and
some of the other stuff, I used any and all techniques to try to get
them to elevate the discussions on our end and hopefully come to some
resolution to get the contract signed. Again, there was never a
contract signed. And Jeff Keller, the vice-president of MMEG, made me
well aware of that. So all I was trying to do with this is trying to
elevate and to show them what their financial exposure was. Whether or
not it was applicable or whether or not there was a contract to it, it
was not even relevant. I'm just working along with what I have
available to me to try to get it expedited. Possibly get them in a
position to want to move so that they wouldn't be exposed.

On October 3, 2008, Rhea sent Janson an email which stated in relevant part:

Hi Kurt,

Please find an outline below of the cancellation details that we discussed yesterday afternoon:

Daiichi/Effient – 10/28/08

Plan A – Cancellation Fees
- Cancelled 9/29/08 (30 days prior to the broadcast)
- 35% of Velocity's Fees Due: $83,208.13
- 90% of F&B Revenue Minimums Due: $134,000[34]
- 100% of F&B Deposits Due: $23,750
- Less Deposits already paid: $15,250.00

- Balance due: $225,708.13

Plan B – Provisions and Cancellation Fees
- Must Re-Schedule broadcast for a date prior to January 31, 2008 (sic).  Must use before this

* * *

Q.  Isn't it true, Mr. Janson, that you're asserting that either MMEG or its client might be required to pay cancellation or postponement fees relating to this broadcast postponement?

A.  I'm not asserting that, Miss Scheib.  What I was not going to do was tell them that, hey, you canceled this, but, by the way, don't worry about it, there's not a contract in place.  We had spent a lot of time on this.  What (sic) I say we, we meaning Velocity and Celerity.  That's we.  Trying to get this done, trying to work through the issues that MMEG had with their master of (sic) services agreement.  So all I did was, and my intent behind this E-mail was lay out financial exposure, whether that was real or fictitious, I can't – you know, that's what I did to try to get that – push the business along and try to get them to understand that we needed to get this thing done.  By no means am I telling them that they're going to be responsible for this.

* * *

(Docket No. 81-9, pp. 7-8 (Depo. pp. 124-26)).
[34] Velocity's hospitality partners, Morton's and Maggiano's, set a food and beverage ("F&B") revenue minimum that was required to be spent in connection with the use of a particular private dining room for a Velocity broadcast. In the event of a late broadcast cancellation, Morton's and Maggiano's were entitled to recover the F&B revenue minimums established for the private dining rooms that had been reserved.  (Docket No. 83, p 15, n. 6).

> 1/31/08 (sic) or full broadcast fees will be owed:
> $381,487.50
> - Full payment of current broadcast must be paid on
>   or before the original schedule date of October 28,
>   2008.  This total amount is $381,487.50
> - Must pay remaining F&B deposit balance due: $8500
>   due to additional 35 boardrooms after the original
>   deposit transaction

\*   \*   \*

(Docket No. 90-35).

On October 6, 2008, Janson sent an email to Jeff Keller of
MMEG regarding the cancellation details for the Effient
broadcast that had been scheduled for October 28, 2008.  The
email stated:

> Jeff,
>
> Per our discussion on Friday I am providing you with an
> overview of what we can offer you/your client (Daichi-
> Sankyo) (sic) and their need to postpone the 10-18-08 (sic)
> broadcast
>
> Established SOW
>
> 79 sites ($225,150)
> 95 Boardrooms
> Production ($117,000)
> F&B Estimate ($197,500) 1975 attendees @ $100 per
> F&B coordination ($7500)
> Misc Exp ($5000)
>
> Estimated Total = $552,150
> Deposits Paid ($15,250)
> Deposits Owed ($8500)
>
> Terms
>
> 1.   Must reschedule and execute this broadcast by January
>      31, 2009.
> 2.   Full payment ($552,150) must be paid prior to original
>      date of 10-28-08

3.   Outstanding site deposit of $8500 must be paid prior
     to original broadcast date of 10-18-08 (sic)
4.   10% postponement fee on Network Access, Production and
     F&B Coordination will apply and must be paid prior to
     original broadcast date of 10-28-08 ($34,965)
     a. Total due Celerity prior to 10-28-08 ($596,615)

Please call me to discuss and establish a timeline
acceptable to all parties.

Kurt

(Docket No. 90-36).

On October 20, 2008, Celerity advised Velocity that the

Effient broadcast scheduled for December 2, 2008 also was being

cancelled.[35]   (Docket No. 97, ¶ 113).   Two weeks later, Emily

Stuart, Maggiano's National Sales Manager, sent an email to Rhea

to which an invoice was attached for the cancellation of the

second Effient broadcast.   The total of the invoice was $5,250,

representing the $250 non-refundable deposits that had been paid

by MMEG to reserve private dining rooms for the broadcast at 21

Maggiano's restaurants.   (Docket No. 78-8).   In a Reseller

Quarterly Forecast completed for Velocity on November 5, 2008,

Celerity described the status of the Effient broadcasts as

"pending contract signature."[36]   (Docket No. 77-4, p. 3).

---

[35] Subsequently, Celerity sold a Velocity program to another customer that was
broadcast on December 2, 2008.   (Docket No. 98-7, p. 2).

[36] Celerity provided additional Reseller Quarterly Forecasts to Velocity on
January 14, 2009, March 2, 2009, April 1, 2009 and May 1, 2009.   In all of
the forecasts, the Effient broadcasts continued to be described as "pending
contract signature."   (Docket No. 76-1, p. 3, No. 77-1, p. 3, No. 77-2, p. 2,
No. 77-3, p. 3).

The issue arising out of the IP provision in Velocity's standard broadcasting agreement remained unresolved as of November 19, 2008, when Janson sent the following email to Franklin:[37]

> Susie,
>
> I just got an email from MMEG that the IP language is still with legal.  As we discussed this morning, I have never spoken for Philip and/or Velocity and certainly would not do so in this situation.  Since the MMEG IP revisions are still with legal I would suggest that we all get on a call to discuss where we are at and more importantly which direction we want to go in.  I can provide the velocity (sic) team with an update and a recommendation.  In the end, it really is Philips (sic) decision and hinges on how he/Velocity wants to handle any further changes in the IP language.  Celerity will support him and velocity (sic) in any decision that is made on the subject.  Let me know if we can get on a call later this afternoon or tomorrow.
>
> Regards,
> Kurt

(Docket No. 77-5, p. 2).[38]

Later that day, Janson reported to Franklin that he still had not heard from MMEG regarding their proposed revisions to the IP language in Velocity's standard broadcast agreement.  (Docket No. 92-6, p. 17).  Elias, to whom Janson's email had been forwarded, sent the following email to Franklin:

---

[37] Approximately two weeks before this email, Morton's inadvertently forwarded a broadcast proposal prepared by Celerity to Franklin which showed that Celerity's production fee for a Velocity broadcast was $120,000.00.  (Docket No. 92-4, p. 41).  Apparently, prior to receiving this broadcast proposal, Velocity was not aware of Celerity's production fee.  (Docket No. 93, p. 7).
[38] In response to this email, Franklin informed Janson that Velocity would need MMEG's proposed IP revisions in writing before a conference call was scheduled.  (Docket No. 77-5, p. 2).

Hi Susie,

Please let Kurt know (and perhaps you have already) that this issue has nothing to do with cancelling the broadcasts and the fees for postponement or cancellation that are due. I also don't believe that we are going to move from the addendum that Celia penned and I submitted to Kurt.

Best regards,
Philip L. Elias

(Docket No. 92-6, p. 17).

Thereafter, MMEG provided Celerity and Velocity with its proposed revisions to the IP language in Velocity's standard broadcast agreement.  On November 22, 2008, Franklin informed Janson that MMEG's proposed revisions were "not within VELOCITY's parameters."  Two days later, Janson informed Franklin that he had notified MMEG that its revisions to the IP language and cancellation terms for the Effient broadcasts were not acceptable to Velocity.  (Docket No. 92-5, p. 13).

On December 2, 2008, Velocity sent an invoice to Celerity for $225,708.13 in cancellation fees for the October 28th Effient broadcast and $228,093.13 in cancellation fees for the December 2nd Effient broadcast.  The cancellation fees for the first Effient broadcast included (a) $83,208.13 representing 35% of Velocity's fees, (b) $134,000.00 representing 90% of the F&B revenue minimums, and (c) $8,500.00 representing the unpaid private dining room deposits.  The cancellation fees for the second Effient broadcast included (a) $81,843.13 representing

35% of Velocity's fees, (b) $146,000.00 representing 90% of the F&B revenue minimums, and (c) $250.00 representing an unpaid private dining room deposit.[39]  Celerity did not pay the invoice. (Docket No. 79-2, pp. 2-4, No. 97, ¶¶ 115-16).

Two weeks later, Velocity sent formal notice to Celerity that it was in material breach of the second reseller agreement for failing to pay the cancellation fees for the Effient broadcasts.  Despite receiving the notice, Celerity did not pay the cancellation fees.  (Docket No. 97, ¶¶ 122-24).

On January 14, 2009, Janson informed Elizabeth Surgil ("Surgil"), one of Velocity's Producers, by email that Effient was scheduled to go before the FDA Advisory Committee for review on February 3, 2009; that full approval of Effient was expected in early March 2009; that MMEG was still interested in working with Celerity on two Effient broadcasts in the summer of 2009; that MMEG's client, Daiichi Sankyo, was committed to repurposing the content of the broadcasts; and that MMEG had begun to investigate other broadcast options, although its first choice was to work with Celerity if Velocity changed its position of the IP language.  Janson then asked Surgil to notify him of

---

[39] There is no evidence that either Morton's or Maggiano's charged Velocity for the F&B revenue minimums applicable to the Effient broadcasts.  Nevertheless, the F&B revenue minimums were included in the invoice sent to Celerity by Velocity.  (Docket No. 96, ¶ 33).

Velocity's position on the IP language "given these latest developments." (Docket No. 92-5, p. 19).

On January 23, 2009, Jeff Keller of MMEG sent an email to Janson requesting an update on Velocity's position regarding the IP provision in its standard broadcast agreement. The email stated: "We have to get an answer to 2 different customers today regarding repurposing the satellite b-casts. They consider the content work for hire as do their legal folks, it's a deal breaker." (Docket No. 92-5, p. 16).

## Reseller Agreement with Maritz

In the summer of 2008, Maritz expressed an interest in selling Velocity broadcasts. A meeting was held on June 17, 2008, to discuss the proposed partnership. Elias, Esswein and Franklin represented Velocity at the meeting, and Steve O'Malley ("O'Malley") represented Maritz. In his record of the meeting, O'Malley noted, among other things, that Celerity was the only reseller of Velocity broadcasts at that time; that Celerity "own[ed] the pharma space;" that all other "verticals" were open; and that Velocity was interested in Maritz serving as a reseller in the financial services and automotive verticals. (Docket No. 92-3, p. 20).

On September 10, 2008, Velocity entered into a reseller agreement with Maritz which granted Maritz the right to sell Velocity's broadcasts to any sector but the pharma sector in

which Celerity had exclusivity.  (Docket No. 76-6, p. 13 (Depo., pp. 149-50), No. 92-4, p. 2).

On November 24, 2008, O'Malley sent an email to Franklin expressing Maritz's desire to serve as a reseller of Velocity's broadcasts in the pharma sector.  Shortly thereafter, O'Malley provided Franklin with the entire list of Maritz's customers in the pharma sector.  In response, Franklin sent a "representative listing" of Velocity's pharma clients adding: "Our exchange is totally confidential at this point – keep close."  (Docket No. 92-3, p. 22).

On March 17, 2009, Franklin sent the following email to O'Malley:

> Glad that we had the call – I am not so sure that "we can make it work" as Jeff mentioned today re: Maritz pursuing or providing pharma leads unless Celerity is involved in some way.
> From my view – it would be a requirement to involve Celerity.  Perhaps that can be done in a way beneficial to all.  I will discuss with Celia.

O'Malley responded as follows:

> Thanks for pushing on this, Susie.  We do see that we will routinely run into these opportunities, especially now that we've launched Velocity to our sales force.  If there is a way that we can bring these opportunities to Velocity in a beneficial way to all involved, that would be great.

(Docket No. 92-4, p. 30).[40]

---

[40] With respect to the discussions taking place between Velocity and Maritz concerning the ability of Maritz to sell Velocity broadcasts in the pharma sector, a declaration of Janson dated March 18, 2011 states: "In approximately August 2008, Elias told me that if he had the ability to go back in time, he would have entered into a reseller agreement with a company

On March 23, 2009, O'Malley sent the following email to

Franklin:

> I know we have sent off some list (sic) of targets to you.
> Could we also get a list of the clients that Celerity has
> already concluded business with so we know who specifically
> that we do business with that we can't sell to?

The next day, Franklin sent the following responsive email to

O'Malley:

> At this juncture, you cannot sell into Pharma at all – per
> the contract language that I provided.  I can give you a
> list of the pharma companies that have done a VELOCITY
> broadcast through Celerity.  Medical Device is wide
> open....

(Docket No. 92-4, p. 27).

The same day, Franklin requested a list of all Velocity pharma

clients by company and drug name from Rhea.  She then sent the

list and the following email to O'Malley:

> The attached pharmaceutical client listing is provided to
> you confidentially for reference only.  All clients on the
> listing were brought to us by our reseller – except St.
> Jude Medical.[41]

---

with 'more feet on the street' (i.e., a large company like Maritz) rather
than a four-person company like Celerity." (Document No. 92-4, p. 37).
Elias does not recall making this statement. (Docket No. 74-3, p. 19 (Depo.
p. 174)).  In its amended answer and counterclaims, Celerity alleges that in
response to Elias's statement regarding his desire for a larger company to
serve as Velocity's reseller in the pharma sector, Celerity offered to
investigate the transfer of a controlling interest in Celerity to Maritz or
another larger reseller "in order to monetize the significant investment that
the principals had made in building Celerity."  Celerity further alleged that
Elias stated that such a transaction would not be in Velocity's best interest
and demanded that Celerity not pursue it. (Docket no. 23, p. 15, ¶¶29-31).
[41] The list included the following pharmaceutical companies with the subject of
the broadcast(s) produced by Velocity in parentheses: (1) Abbot (Simcor); (2)
Astellas (Vesicare); (3) AstraZeneca (Symbicort); (4) Bioform (facial
rejuvenation); (5) Boehringer Ingelheim (Aptivus); (6) Bristol Myers Squibb
(Abilify); (7) Celgene (Revlimid and Vidaza); (8) Cephalon (Treanda and
Provigil); (9) CIBA (vision); (10) Daiichi Sankyo (Effient); (11) Eli Lilly
(Byetta and Cialis); (12) Endo (Voltaren); (13) Genentech (Tarceva); (14)

(Docket No. 92-4, pp. 32-34).

Currently, Maritz is a non-exclusive reseller of Velocity

broadcasts in the pharma sector.   (Docket No. 74-3, p. 19 (Depo.

pp. 173-74)).

## Velocity's Brand Usage Guidelines

In late 2006 or early 2007, Janson created a document for

marketing purposes to describe the services provided by Velocity

and Celerity.   In discussing the communications platform offered

by Celerity in concert with Velocity, the "Overview" refers to

the "Celerity-Velocity HD Suites," the "Celerity-Velocity

solution," and a "Celerity-Velocity broadcast."   (Docket No. 81-

6, pp. 7-8).

The 2008 version of the usage guidelines for Velocity's

brand, which Celerity denies receiving until July 9, 2009,[42]

stated that "[a]s the [Velocity] brand rapidly expands ... it is

critical that its positioning, messaging and brand image be

maintained uniformly and consistently across the spectrum," and

that "[a]ll communications, correspondence and collateral

materials, whether they originate with VELOCITY or not, should

---

GlaxoSmithKline (Vesicare and Lamictal); (15) Johnson & Johnson (Doripenum);
(16) King (Avinza); (17) Novartis (Focalin and Enablex); (18) NovoNordisk
(WDD); (19) OrthoMcNeil (Levoquin and Concerta) (20) PER (oncology); (21)
Sanofi Aventis (Taxotere); (22) Sepracor (Brovana); (23) Shire (Vyvanse);
(24) St. Jude Medical (atrial fibrulation); (25) Takeda (Rozerem, Actos and
Amatiza); (26) The Chatham Institute (Dislypedemia); and (27) UCB (Cimzia).
(Docket No. 92-4, p. 34).
[42] See footnote 5.

adhere strictly to the standards." (Docket No. 90-5, pp. 2-25, No. 97, ¶¶ 128-30).

On December 22, 2008, Velocity sent notice to Celerity that distribution of the "Overview" was a material breach of the provision in the second reseller agreement regarding Celerity's limited license to use Velocity's trademarks and service marks for marketing activities and demanded that Celerity cure the breach. (Docket No. 81-6, No. 97, ¶¶ 132, 134, 140). Despite the foregoing notice, on March 10, 2009, Gatzulis sent Celerity's "Overview" to Ivan Nelson of Sanofi Aventis, a pharmaceutical company that was interested in purchasing a private broadcast produced by Velocity. (Docket No. 97, ¶ 145).

**The Sepracor/Brovana Broadcast Cancellation**

During Celerity's term as a reseller for Velocity, Celerity sold a broadcast for a product called Brovana to HealthLogix, a medical communications company that represented Sepracor, the manufacturer of Brovana. A broadcasting agreement for the Brovana broadcast was executed by Celerity and HealthLogix on November 5, 2008.

On January 13, 2009, the Brovana broadcast, which had been scheduled for February 26, 2009, was cancelled for budgetary reasons. Two days later, Rhea sent the following email to Janson:

Hello Kurt,

40

> Here are the 2/26 Brovana cancellation details.  Because
> this cancellation is due to a budget cut, and not an fda
> (sic) approval issue, our standard cancellation policies
> will apply.  However, if Brovana does decide to re-book in
> 2009 Velocity is willing to keep an open mind.

Senko attached a revised invoice for the Brovana broadcast

cancellation fees to an email to Gatzulis on January 26, 2009.

The cancellation fees, which totaled $145,648.38, were paid by

Celerity.[43]  (Docket No. 79-3, pp. 2-7, No. 82-1, pp. 7-16, No.

97, ¶¶ 117-19).

### The Enablex Broadcast in Blue Bell, Pennsylvania

On May 28, 2009, Velocity produced an off-site broadcast

for one of Celerity's customers for a product called Enablex

during which the audience response system ("ARS") failed.[44]  The

next day, Janson sent an email to Surgil (a Velocity Producer)

which stated in part:

> Elizabeth,
>
> I write as principal of both Celerity Healthcare Solutions,
> Inc. ("Celerity") and Therapeutic Decisions in Medicine,

---

[43] In opposition to Celerity's motion for summary judgment and in support of
its cross-motion for summary judgment on the claim that Celerity is liable
for cancellation fees for the Effient broadcasts, Velocity places great
weight on Celerity's payment of the cancellation fees for the Brovana
broadcast that had been scheduled for February 26, 2009.  Velocity fails,
however, to acknowledge the significant difference between the Brovana
broadcast and the Effient broadcasts, i.e., the execution of a broadcasting
agreement for the Brovana broadcast prior to its cancellation.  Moreover, as
noted by Rhea in her January 15, 2009 email, the Brovana cancellation was due
to a budget cut, not a delay in FDA approval.  Thus, Velocity's standard
cancellation policies applied.

[44] The Enablex broadcast was produced in Blue Bell, Pennsylvania, rather than
the Pittsburgh studio normally used by Velocity to produce its broadcasts.
(Docket No. 81-11, p. 2 (Depo. p. 286)).

LLC ("TDIM") to advise you of some serious concerns we have
regarding last night's Enablex broadcast.[45]

As you are well aware, ARS failed across the board last
night.  Needless to say, we are embarrassed and
disappointed because of velocity's (sic) failures.  At this
time, our investigation has begun regarding the cause of
the ARS failure.  Both our primary and backup computers are
being analyzed.  One important point, however, is that the
backup computer appears to be damaged as a result of
shipment via Federal Express.  A major part of your
rationale for the extra cost of the private jet was that
the equipment would be delivered safely and promptly.  Now,
we find out that the ARS computers were shipped via FedEx?
Celerity acquiesced to the charges for private jet service
predicated upon these discussions.  As we have retained the
shipping labels from FedEx, Celerity has been overcharged
and had an important part of the broadcast ruined as a
result of Velocity's actions.

Another important point involves the $12,500 R&D and
configuration charges to TDIM.  Apparently, these
activities didn't begin until a day prior to the broadcast.
In fact, Leon made a comment that the set up was exactly
the same as the studio in Pittsburgh.  Celerity's position
is that the additional R&D and configuration charges, in
addition to being a complete failure, are suspect to say
the least.

                    *    *    *

As a result of last nights (sic) debacle, TDIM has been
left with no other choice but to issue stop payment orders
for the approximately $21,000 in checks that we have
forwarded to you for the ARS portion of this broadcast.[46]
Quite frankly, we question whether any monies are due to
Velocity as a result of the ARS failure.  We will continue

---

[45] TDIM was a company started by Janson and Gatzulis to provide audience
response pooling capabilities during Velocity broadcasts.  (Docket No. 81-1,
p. 8 (Depo. p. 26)).
[46] The $21,000 in checks on which payment was stopped included the $12,500
charged by Velocity for R&D and configuration services and the handset
commission due to Velocity for the ARS services.  (Docket No. 81-10, p. 23
No. 81-11, p. 3 (Depo. pp. 280, 292-93)).

to keep you in the loop as our investigation unfolds.

Regards,
Kurt

(Docket No. 92-6, p. 82).

Esswein (Velocity's COO) responded to Janson's email by

letter, stating in part:

Dear Kurt -

I am in receipt of your most recent e-mail which you sent
to Elizabeth Surgill (sic) on Friday, May 29th, 2009.  This
e-mail once again shows typical Celerity style which is not
only off base, inaccurate, and accusatory but does not
contain one valid statement.  Your approach to this e-mail
is symbolic of why Celerity and VELOCITY are in the current
state of affairs.

It is clear that the ARS portion of the Enablex Broadcast
failed; however, it is not clear the cause of the failure
at this time.  I do know, from our VELOCITY Team and the
ISP Company, the set-up and backbone were enabled and
operational as specified and promised.  Before you jump to
conclusions and blame the entire failure on VELOCITY it
would be advantageous for you to have all of the facts.[47]

Campus your ARS provider, selected the carrier and sent
VELOCITY the Federal Express mailing labels; so this should
have been no surprise to you.  The computers were never
being sent via jet service with the VELOCITY team.

---

[47] With regard to his understanding of the cause of the ARS failure during the
Enablex broadcast, Janson testified during his deposition as follows:

                              *    *    *

Q.  How do you know that ARS didn't fail because of some flaw in the
Audience Response System software or the bay stations owned by TDIM?

A.  I was told that everything was checked out.  It was an Internet
connectivity issue.  That's what I know.

                              *    *    *

(Docket No. 81-11, p. 4 (Depo. p. 293)).

VELOCITY will provide a detailed incident report between all parties involved with specific logistical information from Debbie Minor and Campus as well as all logs of specific connectivity report from the Internet Service Provider.  I would suggest that Celerity provided a detailed incident report.

Kurt, as you are aware this is not the first time that your ARS system has failed during an off campus broadcast as well as productions generated out of the VELOCITY studios.

Please note:

As of June 1, 2009 the TDIM ARS system will no longer be available as part of any broadcast.  We are in the process of notifying our clients; I suggest you notify Celerity clients immediately.  Please cc VELOCITY on all correspondence to this regard.  If your clients would still like to use an ARS system; (sic) a new, more advanced and stable system will be available shortly.  Details and pricing will be provided.[48]

*    *    *

Regards,
Jeffrey P. Esswein

(Docket No. 92-6, pp. 79-80).

## Proposed Broadcasts for AZ in 2009

On September 30, 2008, Esswein sent an email to Janson

which stated in part:

Kurt—

Philip just gave me a call and said that you were putting together a proposal for AZ for 2009.  I have included a copy of our new rate card in an electronic PDF format.  This will allow you to price any future and long term business opportunities appropriately with AZ....

---

[48] TDIM ceased business operations after Velocity's notification that it would no longer use TDIM's services to provide audience response capabilities for its broadcasts.  (Docket No. 81-1, p. 8 (Depo. p. 27)).

This new rate card and its pricing will go into effect October 1, 2008 but if you have any pending contracts that are on the table for 2008/2009 and you close them prior to October 31st, 2008 the old rates will be applicable.  If you have any questions in reference to this rate card please don't hesitate to give me a call....

Thanks, Jeff

(Docket No. 92-5, p. 36).

On January 2, 2009, Surgil (a Velocity Producer) informed Janson by email that Velocity would have a proposal for AZ's 8-broadcast package by the end of the following week, and that Velocity would hold the $2850 network access rate specifically for AZ until the end of January if they decide to move forward and book their 2009 broadcasts.  (Docket No. 92-5, p. 42). Three days later, Surgil confirmed with Janson by email that Velocity would hold the $2850 network access rate specifically for AZ until the end of January, and would have a proposal with regard to AZ's broadcast repurposing requests by the end of the week.  (Docket No. 92-5, p. 41).  Several hours later, Janson informed Surgil that AZ had called and emailed that morning regarding their immediate need to know Velocity's position on the IP issue, noting that Esswein had verbally committed to having a repurposing proposal for AZ by that day and that time was of the essence because an AZ broadcast was proposed for February 2009.  Janson also informed Surgil that AZ had

requested a conference call with Celerity and Velocity that afternoon.  (Docket No. 92-5, p. 41).

The next day, January 6, 2009, Surgil emailed Elias, Esswein and Franklin to recap the discussion that had taken place the previous day with AZ.  Surgil noted that she updated AZ with respect to the extension of the network access fee of $2850 and informed AZ that although the January 5th deadline for the repurposing proposal would not be met, AZ would receive the proposal by January 9, 2009.  Surgil then stated:

$$* \quad * \quad *$$

> As it stands right now we are in jeopardy of losing 2 broadcasts (Symbicort and Serequel) due to the delay in getting the IP issue resolved.  They (AZ) were very disappointed at velocity's (sic) inability to meet a deadline that was committed to by Jeff Esswein on December 23, 2008 and that no one from velocity (sic) was able to join us on the call today to explain why the January 5, 2009 committed date was not met.  It was said more than once that they feel as though velocity (sic) does not understand the pharmaceutical market and that velocity (sic) is taking their (AZ's) business for granted.  They also wanted me to let you know that they don't quite understand why a "proposal" from velocity (sic) is necessary as it pertains to their request.  They stated that they "were very clear" with what they needed in order to move forward.
>
> It is imperative that a decision is made on the subject and provided to AZ for comment immediately.

$$* \quad * \quad *$$

(Docket No. 92-5, p. 59).

On January 9, 2009, Surgil attached Velocity's repurposing

proposal for AZ to an email to Janson which provided in relevant

part:

> VELOCITY Broadcasting offers AstraZeneca a special
> promotional re-purpose program for its April 2009 broadcast
> per our conference call on January 16, 2009 the parameters
> are as follows:
>
> AstraZeneca April 2009 Broadcast
> - Network Access Fee $3450.00 per site
> - Production fee: $59,500.00 per broadcast
> - 50 site minimum
> - Broadcast dates are subject to availability and must
>   be booked in advanced to assure desired dates
>
> AstraZeneca April 2009 Re-Purpose Rights Parameters:
> - One Year Non-Air Unlimited Use
> - $20,000 dollars

(Docket No. 92-5, p. 9).

Janson requested the foregoing proposal for AZ in the form

of a legal document.  In an email to Janson on January 23, 2009,

Surgil stated: "I spoke to Philip and Jeff and they both agree

with the language currently on this proposal.  It states

everything that Eric Anderson of AZ agreed to on our call on

1/16 and is very specific in reference to the one year non-air

unlimited use for their April broadcast at $20,000.  Please use

this document for AZ."  (Docket No. 92-5, p. 57).  In his

responsive email, Janson stated: "This isn't exactly what I was

looking for as this will be going into AZ legal.  That said,

please have Philip add his signature and send it back to me."[49]

(Docket No. 92-5, p. 57).

On February 9, 2009, Janson sent an email to Surgil

stating:

> Can you please provide me with an update on when I might
> expect the legal language for the AZ – April 16, 2009
> broadcast as it relates the agreed upon repurposing scope
> and fee.  As you can read below I was to have it by
> Wednesday, January 28, 2009.  Without this a contract
> cannot be reviewed, a PSA created, reviewed, executed, a
> PO# assigned and ultimately an invoice for payment
> generated.  This broadcast is fast approaching so your
> immediate attention to this is necessary.

(Docket No. 92-5, p. 50).

On February 11, 2009, Janson sent another email to Surgil

stating: "Yesterday came and went with nothing from velocity

(sic) as it pertains to AZ's ability to repurpose their content

within the agreed upon conditions.  Without this document from

velocity (sic) we are unable to execute the PSA.  Please let me

know when I might expect to have this so that I can let AZ

know."[50]  (Docket No. 92-5, p. 50).  Several hours later,

Georgiean Geanopulos ("Geanopulos") of AZ sent an email to

Janson noting that AZ "ha[d] been issued a 'no price increase'

order."  She then stated: "I shared with our leadership team

---

[49] Around this time, Celerity lost the sale of a broadcast to a pharmaceutical
company called Avanstar due to Velocity's position with regard to
repurposing.  In an email to Janson on January 12, 2009, the client stated:
"Sorry this couldn't work out but clearly Velocity has a lot to learn about
working in the pharmaceutical industry.  Please keep in touch as they realize
they are turning away business with this policy."  (Docket No. 92-5, p. 24).
[50] Surgil responded: "I will let you know ASAP......"  (Docket No. 92-5, p.
44).

that Velocity has increased the network access fee and now has a
repurposing fee for 2009.  Additionally, I shared that Velocity
has not responded to our repeated requests for a breakdown and
explanation for the increase in the Network Access Fee.  The AZ
Procurement Leadership team, has now asked for a breakdown for
the repurposing fee as well as the broadcast fee in terms of
actual media time, people's hours etc." Geanopulos's email was
forwarded by Janson to Surgil requesting a date by which
Velocity would provide the additional information for AZ.
(Docket No. 92-5, p. 48).

On February 17, 2009, Janson inquired yet again of the
status of the "necessary legal language from velocity (sic) as
it pertains to AstraZeneca's ability to repurpose their
broadcast," noting that he had been compelled "to field numerous
calls from AstraZeneca regarding its whereabouts."  Janson also
noted that without the language from Velocity, execution of a
broadcast agreement with AZ was impossible.  Finally, Janson
indicated that AZ had requested a conference call in the next
24-48 hours to discuss the delay in the legal language for
repurposing and an explanation for the 2009 increase in network
access fees.  (Docket No. 92-5, p. 44).

The next day, Surgil sent the following email to Janson:

Kurt,

Thank you. We certainly appreciate you closing the loop on
the AZ contract. However, the confusion and persistence on
the detailed language in the form of a legal document
requested from Celerity is perplexing considering our
contract is with you. The language I referred to (from
legal) was only to provide additional detail to the Re-Use
Rate Card. We have never had a contract direct (sic) with
any of Celerity's clients and if this is what is being
requested then we will need to have one drafted
appropriately through our legal team which would have to be
inclusive of an entire VBA contract.

If you need to add an addendum to your contract with AZ
then it should be drafted through your legal team and
should be no different than any other rate card item.   I
have attached our proposal with the definition of "one year
non-aired unlimited use content" for your convenience.

As for the rate increase of $2850 vs. $3450 we have not
only explained this but also included the published rate
cards and highlighted the difference in rates.   I would
think as our re-seller you would be able to articulate
these increases to your client in a positive light with the
value added components.   Remember these rates have been
published since last September and went into effect in
October.   Jeff's email certainly provided enough detail on
the increase of our rates.

That said; (sic) we would be happy to participate in a
conference call....

(Docket No. 92-5, p. 53).

A conference call was held on February 19, 2009 regarding

clarification of the terms of Velocity's repurposing fee.

Esswein participated on Velocity's behalf in the call.   Three

days later, Esswein sent the following email to Geanopulos of

AZ: